## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| o9 Solutions, Inc., <br><br> Plaintiff, <br><br> v. <br><br> SAP SE, SAP America, Inc., Stephan de Barse, Stijn-Pieter van Houten, and Sean Zonneveld, <br><br> Defendants. | Case No. 3:25-CV-3245 <br><br> **COMPLAINT** <br> **JURY TRIAL DEMANDED** |

### COMPLAINT

Plaintiff o9 Solutions, Inc. ("o9" or "Plaintiff") brings this action against Defendants SAP SE, SAP America, Inc. ("SAP America"), Stephan de Barse ("de Barse"), Stijn-Pieter (SP) van Houten ("van Houten"), and Sean Zonneveld ("Zonneveld")[1] as follows:

### INTRODUCTION

1.      o9 brings this action to prevent SAP and o9's former employees de Barse, van Houten, and Zonneveld, who now work for SAP, from exploiting o9's most sensitive and valuable trade secrets in violation of federal and state law, and in breach of their legal and contractual obligations to o9.  Individual Defendants mass downloaded over 20,000 o9 files in coordination with each other and with SAP to misappropriate o9's trade secrets and confidential materials prior to their departures from o9.  These downloads far exceeded their ordinary download activities and occurred contemporaneously with their communications with SAP executives.

---

[1]    SAP SE and SAP America collectively are referred to as "SAP."  Individual defendants de Barse, van Houten, and Zonneveld collectively are referred to as "Individual Defendants."  All defendants are collectively referred to as "Defendants."

2.    Founded in 2009, and based in Dallas, o9 is a pioneer in delivering industry-leading AI and machine learning based enterprise planning and supply chain management technologies. In particular, since its founding, o9 has developed and delivered widely acclaimed software that is powered by AI and machine learning technology to deliver enterprise planning capabilities such as demand forecasting, commercial planning, supply chain planning, and other integrated business planning solutions to customers including some of the largest and most sophisticated companies in the world.  Through its innovation and development of its disruptive technologies, o9 has evolved from a small start-up into a global technology company with 17 offices and 2,500 employees throughout the world.

3.    At the core of o9's technological offerings is its innovative cloud-native platform called "Digital Brain," which uses Artificial Intelligence/Machine Learning (AI/ML) capabilities and advanced analytics and algorithms powered by its invention called Enterprise Knowledge Graph ("EKG").  o9's comprehensive end-to-end EKG provides digital models of data and knowledge to enable real-time propagation of changes across an enterprise.



4.      In an industry that has long been stagnant and constrained to slow, inflexible, and monolithic legacy solutions, o9 has paved the way for the next generation of enterprise planning and supply chain management technologies through its Digital Brain platform, which offers real-time visibility and actionable insights into business operations.  In just over a decade, o9 had already achieved "unicorn" status, valued at over $1 billion.   And between 2020 and 2025, o9 realized substantial year-over-year ("YoY") revenue growth, including a 65% YoY subscription growth in 2022, 47% in 2023, 37% in 2024, and 63% in Q1 of 2025.

5.      As a disruptive force in the traditional enterprise planning market, o9's substantial growth and success have drawn the industry's attention, including that of SAP.  SAP has been the world's largest vendor of legacy enterprise resource planning (ERP) software.  In the early 2000s, SAP launched the first generation of its enterprise planning and supply chain management solution, Advanced Planning and Optimization ("APO"), which is still in operation today.  Unlike o9's modern AI/ML-based data-integrated platform, SAP's legacy APO platform relies on

traditional database infrastructures, focusing on on-premises developments, and offering limited real-time analytical capacity and visibility.

6.    Realizing the deficiencies of its legacy APO offering, SAP released a next-generation supply chain management solution, dubbed Integrated Business Planning ("IBP"), to try to compete in the advanced business planning solutions space.  In an attempt to encourage its customers' migration from APO to IBP, SAP announced its plan to retire APO by 2027.  However, contrary to SAP's expectation, the market has demonstrated significant resistance and hesitation towards implementing SAP's IBP platform due to its high costs, long timeline, operational risks, and poor implementation and support for existing customization.  As a result of the failings in SAP's offerings, numerous APO customers decided to move away from SAP services to other vendors, including o9, for a better, more refined platform.

7.    Facing great time pressure with the announced sunset of APO on the horizon, beginning no later than the end of 2024, SAP launched an aggressive campaign to target o9's trade secrets through senior o9 executives who were entrusted with o9's trade secrets and confidential materials, and were responsible for executing o9's strategic vision.  SAP started its campaign at the top of o9's senior leadership, recruiting Defendant de Barse, o9's former Chief Revenue Officer, as a step towards bringing large volumes of o9's trade secrets and confidential materials to SAP.

8.    On January 3, 2025, after working at o9 for 7 years, de Barse gave o9 formal notice that he would resign and leave the company on February 28, 2025.  As a member of o9's senior leadership, de Barse played a critical role in executing o9's growth strategies and establishing o9's global presence.  By the time he left o9, over thirty of o9's management leaders reported to de Barse, including Defendants Zonneveld, van Houten, and other product, sales, and marketing

executives.  De Barse solicited and coordinated with van Houten and Zonneveld to leave o9 shortly after him on May 30, 2025.  Numerous other o9 executives and senior employees have also left o9 as a result of recruitment and solicitation by de Barse, van Houten, and Zonneveld.

9.     SAP not only recruited o9 *employees*, but it also put in motion a plan to exfiltrate large quantities of o9 *trade secrets* for use at SAP.  Specifically, in view of his forthcoming departure, de Barse coordinated with van Houten and Zonneveld to mass download over 22,000 o9 files from o9's Google shared drives.  For example, on December 30, 2024, after meeting with de Barse, van Houten downloaded over 9,000 o9 files from o9's Google shared drives, including confidential o9 materials relating to product design, implementation, roadmap, demonstrations, testing, and more.  Two days later, on January 1, 2025, van Houten downloaded over 2,690 additional o9 files, including confidential o9 materials.  In parallel, on December 30 and 31, 2024, Zonneveld sent himself separate emails to test and to remind himself to "Download Spullen."[2] Then, on January 3, 2025, the date on which de Barse gave formal notice of his resignation, Zonneveld downloaded over 1,200 o9 files, including confidential o9 materials.  These downloads were very unusual and far exceeded their ordinary download activities.

10.    Both van Houten and Zonneveld continued to mass download o9 files (including confidential o9 materials) until they submitted their formal notices of resignation on April 29 and April 30, respectively.  Both left o9 a month later on May 30, 2025.  For the entire period between December 1, 2024, and May 30, 2025, van Houten and Zonneveld collectively downloaded more than ***22,000*** o9 files, which included o9's trade secrets and confidential materials pertaining to o9's technical implementation, product strategies, sales and marketing strategies, and client-specific data and projects, as described in detail below.

---

[2]    "Spullen" is a Dutch word that translates to "stuff" in English.

11.    Notably, forensic evidence reveals that throughout the entire time de Barse, van Houten, and Zonneveld coordinated their departures from o9 and misappropriated large quantities of o9's trade secrets and confidential materials, each of them was in close contact with SAP. Between November 2024 and February 2025, senior SAP executives and de Barse had in-person and telephonic conversations on a regular basis.  Similarly, Zonneveld had meetings with SAP executives prior to his resignation from o9.  For example, Zonneveld met with SAP's Chief Revenue Officer, Peter Graulich, on around February 19, 2025, in Atlanta.  De Barse, Zonneveld, and van Houten also purposefully attempted to conceal their communications with SAP prior to their departures from o9, including by deleting records of their emails, phone calls, in-person meetings, and other communications, correspondence, and meetings with SAP.

12.    Despite these deletion efforts, forensic evidence reveals that SAP employees corresponded with the Individual Defendants about the subject matter of o9's trade secrets simultaneously with the Individual Defendants' mass downloading.  For example, on January 31, 2025, Zonneveld mass downloaded over 530 files, almost all of which contain confidential o9 information regarding one of o9's former top clients, Henkel.  Just four days later, on February 4, 2025, and while still employed by o9, de Barse exchanged email correspondences with SAP's leadership team regarding "***Alignment Henkel***."

13.    Further evidencing Defendants' coordinated theft and use of o9's trade secrets and confidential materials, SAP recently revised the features and marketing materials for its IBP solutions and other ERP software to closely mimic ***o9's*** offerings.  Although SAP IBP was introduced as early as 2013, it was not until the time of de Barse's first known interaction with

SAP's leadership that SAP unveiled its "SAP Knowledge Graph," in addition to new capabilities found in o9's existing offerings, such as "Integration with AI and Machine Learning."[3]



14.     By February 19, 2025, while de Barse, Zonneveld, and van Houten were communicating with SAP's leadership and mass downloading o9's trade secrets and confidential materials, SAP also started using identical language as o9 to identify and describe its "knowledge graphs," including the term "Enterprise Knowledge Graph."[4]  These new announcements and features reflect o9's confidential and trade secret information regarding o9's platform design and implementation.

---

[3]    Angus Macauly, *SAP Knowledge Graph*, Oct. 24, 2024, https://ignitesap.com/sap-knowledge-graph/ (accessed on November 23, 2025).

[4]    February 19, 2025, *Become an Early Adopter for the Knowledge Graph Engine in SAP HANA Cloud*, https://community.sap.com/t5/technology-blog-posts-by-sap/become-an-early-adopter-for-the-knowledge-graph-engine-in-sap-hana-cloud/ba-p/14021136 (accessed on November 23, 2025).

15.    o9 recognizes the importance of fair competition, innovation, and employee mobility.  However, o9 cannot—and will not—allow its trade secrets to be misappropriated, especially where former employees surreptitiously engage with a competitor in a concerted effort to steal o9's intellectual property.  Trade secret theft fundamentally undermines the substantial investments that o9 has made in researching, developing, and providing clients with transformative solutions that enhance their business operations.  Here, the nature, volume, and timing of the mass downloading activity, SAP's simultaneous communications with and employment of the Individual Defendants in overlapping roles at SAP, and the competitive benefits that have been and will continue to be conferred on SAP by having access to o9's trade secrets have left o9 with no other choice but to bring this action.

## **THE PARTIES**

16.    Plaintiff o9 Solutions, Inc. is a Texas corporation having its headquarters and principal place of business at 1501 Lyndon B Johnson Fwy Suite 140, Dallas, TX 75234.

17.    Defendant SAP SE is a German corporation having its headquarters and principal place of business at Dietmar-Hopp-Allee 16, 69190 Walldorf, Germany.  With offices in 130 countries, more than 110,000 employees, and more than 34 billion Euros in annual revenue, SAP is the fourth largest software company in the world behind only Microsoft, Oracle, and Google. SAP SE has more than 20 offices in the United States, including SAP America's.

18.    Defendant SAP America, Inc. is a Delaware corporation with its principal place of business located at 3999 West Chester Pike, Newtown Square, PA 19073.  SAP America is a wholly owned subsidiary of SAP SE.  SAP America is registered to conduct business in Texas and can be served through its agent at 1999 Bryant Street Suite 900 Dallas, Texas 75201.

19.     Defendant Stephan de Barse is a Dutch citizen who resides in the Netherlands.[5]  De Barse was employed at o9 between August 2018 and February 2025, when he departed from his role as Chief Revenue Officer of o9.   De Barse currently serves as President of SAP's Global Business Suite.

20.     Defendant Sean Zonneveld is a Dutch citizen who resides in the Netherlands.[6]  Zonneveld was employed at o9 between July 2019 and May 30, 2025, until he departed from his role as Global Senior Vice President of o9.  Zonneveld now serves as SAP's Global Chief Revenue Officer, Procurement.

21.     Defendant Stijn-Pieter van Houten is a Dutch citizen who resides in the Netherlands.[7]  Van Houten was employed at o9 between September 2020 and May 30, 2025, until he departed from his role as Senior Vice President and Knowledge Innovation Lead at o9.  Van Houten currently serves as SAP's Chief Product Officer, Supply Chain Management Planning.

## JURISDICTION AND VENUE

### A.     Subject Matter Jurisdiction

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises out of violations of federal law under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836, *et seq.*   Each Defendant committed "act[s] in furtherance" of the trade secret misappropriation scheme, including by travelling to the United States to acquire and discuss o9's trade secrets, organizing and attending industry conferences in the United States, and creating,

---

[5]     Ex. 1, http://linkedin.com/in/stephandebarse-driving-digital-transformation.

[6]     Ex. 2, https://www.linkedin.com/in/seanzonneveld.

[7]     Ex. 3, https://www.linkedin.com/in/stijnpietervanhouten.

marketing, selling, and promoting products embodying and derived from the stolen trade secrets in the United States, including as detailed below. 18 U.S.C. § 1837(2).

23.     This Court also has diversity jurisdiction over the subject matter of this action because there is diversity of citizenship between the parties pursuant to 28 U.S.C. § 1332(a) and the amount in controversy exceeds $75,000, exclusive of interests and costs.  Plaintiff o9 is a Texas corporation having its headquarters and principal place of business in Dallas, Texas.  Defendant SAP America is incorporated in Delaware with its principal place of business in Newton Square, PA.  Defendant SAP SE is a German corporation having its headquarters and principal place of business in Walldorf, Germany.  On information and belief, Defendants de Barse, van Houten, and Zonneveld are all Dutch citizens who do not have a permanent residence in any state of the United States.

24.     This Court also has supplemental jurisdiction over any asserted state law claims pursuant to 28 U.S.C. § 1367(a) because the federal claims under the Defend Trade Secrets Act are so closely related to o9's state law claims that they form part of the same case or controversy.

**B.     Personal Jurisdiction**

25.     This Court has personal jurisdiction over each Defendant pursuant to the Due Process Clause of the United States Constitution and the Texas Long Arm Statute because each Defendant purposefully availed itself of the benefits and privileges of conducting business in this jurisdiction and targeted the state of Texas, and the exercise of this Court's jurisdiction over the Defendants is fair.  Among others, Defendants misappropriated trade secrets that were developed and maintained in Texas, exploited the misappropriated trade secrets to unfairly compete with o9 in Texas, executed and then breached contracts with o9 governed by Texas law, violated Texas statutory and common law, and systematically conducted and conduct business in Texas, including

by traveling to Texas, maintaining Texas-based offices, and targeting Texas-based customers to compete with o9.

26.     o9 is a Texas corporation headquartered in Dallas, as known to Defendants.  o9's senior leadership, including its C-Suite executives, work out of o9's headquarters in Dallas.  The trade secrets at issue in this case were developed by o9's senior leadership and employees at o9's headquarters and are entirely owned by o9.  These trade secrets at issue are centrally maintained from o9's headquarters in Dallas.  o9's Information Technology team is led by its Director of Global Information Technology (IT) based in o9's Dallas office, who is directly responsible for managing o9's global information technology operations and the digital infrastructure for securing and provisioning access to o9's internal servers, file repositories, and data exchange and communication systems.

27.     Defendants de Barse, Zonneveld, and van Houten have established minimum contacts with the State of Texas through their former employment with o9 and their trade secret misappropriation activities, as detailed in this Complaint.  During their employment at o9, de Barse, Zonneveld, and van Houten each signed agreements with o9 setting forth their confidentiality, non-disclosure, and non-solicitation obligations to o9, and each agreed to be bound by the laws of the state of Texas for purposes of their respective agreements. o9's breach of contract claims against the Individual Defendants arise out of these same Texas-based contracts.

28.     As senior executives of o9, de Barse, Zonneveld, and van Houten worked closely with o9's senior leadership at o9's headquarters in Dallas by both remotely communicating with o9's leadership team and by regularly traveling to o9's headquarters in Dallas to conduct o9 business, including in relation to the misappropriated trade secrets. De Barse, Zonneveld, and van Houten were at the center of o9's efforts to develop and leverage its trade secrets and in working

with o9's Texas-based customers including, for example, computer hardware and technology companies, oil and gas companies, consumer packaged goods companies, and food and beverage companies.

29.    For instance, on around September 27, 2024, de Barse, as o9's then-Chief Revenue Officer, gave an opening speech at the "aim10x Dallas" event, which was attended by o9 partners and customers in Dallas.[8]



---

[8]    https://o9solutions.com/articles/the-takeaways-from-aim10x-dallas-2024/ (published October 4, 2024; accessed on November 23, 2025).

30.     Van Houten similarly traveled to Dallas to attend o9's aim10x Dallas conference, meeting with o9's customers and conducting o9-related business using o9's trade secrets.[9]



31.     De Barse, Zonneveld, and Van Houten all have travelled to Dallas after 2025.  For example, on around March 18, 2025, Zonneveld travelled to Dallas to meet with o9's wireless network and telecommunications customer.[10]

---

[9]     *See, e.g.*, Ex. 4, https://www.linkedin.com/posts/stijnpietervanhouten_aim10xsummit-aim10x-supplychain-activity-7308049851026427904-uHuq/ (van Houten LinkedIn announcing attending "aim10x Americas – September 10th, Dallas US").

[10]    Ex. 5, https://www.linkedin.com/posts/seanzonneveld_o9solutions-tmobile-activity-729257821177841459-tqo8/?utm_source=share&utm_medium=member_desktop&rcm=ACoAABbLnTgBVRNYpeeofx7yg7ZtVh4ZGrB3GoA.



Go&Sees are truly special events. Through engaging discussions, live demos, and deep dives into innovative solutions, you'll learn how T-Mobile managed to deliver $1B in value while boosting productivity and service levels!

If you're interested in attending on March 18th, you can request to join here: https://okt.to/qFO9jX

#o9solutions #tmobile

32. After leaving o9 to join SAP, de Barse, Zonneveld, and van Houten continue to conduct business in Texas, including by exploiting the stolen trade secrets on behalf of SAP to compete with o9, including in Texas. De Barse, Zonneveld, and van Houten play key roles in SAP's efforts to specifically target the Texas market and divert o9's major Texas-based customers. For example, in July 2025, de Barse travelled to Dallas for SAP's "Americas Senior Leadership Team offsite," stating "[t]he opportunity in front of us is massive – and we're ready to deliver real impact for our customers."[11]

---

[11] Ex. 6, https://www.linkedin.com/posts/stephandebarse-driving-digital-transformation_leadership-sap-customersuccess-activity-7351965847264849921--3tF/?utm_source=share&utm_medium=member_desktop&rcm=ACoAABbLnTgBVRNYpeeofx7yg7ZtVh4ZGrB3GoA.



33.     This Court also has personal jurisdiction over Defendants SAP SE and SAP America because they committed acts of misappropriation and infringement within this District, including by targeting o9's employees and o9's trade secrets and confidential materials developed and maintained in Texas as part of a coordinated scheme to undermine o9's ability to compete with SAP.  SAP SE and SAP America independently and jointly conduct business in this District and derive substantial revenues and benefits from customers in this District and in Texas, including by exploiting o9's trade secret information to target the Texas market and o9's Texas customers.

34.     On its website, SAP SE highlights SAP America as one of its "Worldwide Office Locations," which operates branch offices in Houston and Plano, Texas.[12]

---

[12]     https://www.sap.com/about/company/office-locations/usa.html (accessed on November 23, 2025).






35.     SAP SE and SAP America have sales and engineering teams in this District and Texas broadly providing business planning and supply management services to customers in Texas and nationwide, including, for example, Dallas, Plano, and Houston.[13]

---

[13]https://www.linkedin.com/search/results/people/?keywords=supply%20chain&origin=GLOBAL_SEARCH_HEADER&geoUrn=%5B%22102748797%22%5D&currentCompany=%5B%22115%22%5D (accessed on November 23, 2025).



**Kelly Jones** ✓ · 3rd+
Digital Supply Chain Consultant | SAP
Houston, Texas, United States
Current: Digital **Supply Chain** Consultant at SAP

[ ✈ Message ]

**Amadu Jalloh, MBA** ✓ · 3rd+
Solutions Engineer | Supply Chain Management
Dallas, Texas, United States
Current: Solutions Engineer | Digital **Supply Chain** at SAP

[ ✈ Message ]

**Dhruv Vaghani** ✓ · 3rd+
Driving Customer Success in Supply Chain @SAP
Plano, Texas, United States
Current: Customer Success Manager - **Supply Chain** Management at SAP

[ ✈ Message ]

**Paula M. Bermudez** ✓ · 3rd+
Supply chain management Customer success manager at SAP
Greater Houston
Current: Specialized Customer Success Partner (**Supply Chain**) at SAP

[ ✈ Message ]

**Adel Khan** 🔗 · 3rd+
Digital Supply Chain - SAP
Frisco, Texas, United States
Current: Extended **Supply Chain** - SAP at SAP America

[ ✈ Message ]

**Sandeep Pratap** ✓ · 3rd+
Director/Delivery Advisor and Product Expert @ Sap Ariba Supply Chain Collaboration
Fulshear, Texas, United States
Current: Director **Supply Chain** Collaboration at SAP

[ ✈ Message ]

**Mani Chinnam** ✓ · 3rd+
SAP S/4 HANA | SAP Ariba | Procurement | Business Network for Supply Chain Collaboration |
Business Process Senior Consultant at SAP
Austin, Texas Metropolitan Area
Summary: ...technologies to create value across the **Supply Chain**...

[ ✈ Message ]

**Steve Willet** ✓ · 3rd+
Solutions Sales Executive driving innovative Digital Supply Chain solutions at SAP
Houston, Texas, United States
Current: Solutions Sales Executive/ SAP Digital **Supply Chain** at SAP

[ ✈ Message ]

**Najma Jaha** ✓ · 3rd+
Solution Advisory @ SAP | Previously GoPuff, Amazon, Tesla
Houston, Texas, United States
Current: Solution Advisor - Digital **Supply Chain** at SAP

[ ✈ Message ]

**Sudhakar Kotturu** ✓ · 3rd+
SAP Principal Consultant-Supply Chain, MBA RICE - Jones School of Business, Enterprise
Architect, Business AI GTM Strategist.
Houston, Texas, United States
Past: Specialist Master at Deloitte - SAP **Supply Chain**

[ ✈ Message ]

36.     Specifically, as to this District, more than 20 SAP employees are located in the Dallas or Fort Worth area, including for example: [14]



37.     SAP SE and SAP America hire employees through the same website. Currently, SAP actively hires for technical, sales, and customer service positions in Texas:[15]

---

[14] https://www.linkedin.com/search/results/people/?keywords=supply%20chain&origin=GLOBAL_SEARCH_HEADER&geoUrn=%5B%22104194190%22%5D&currentCompany=%5B%221115%22%5D&page=1&spellCorrectionEnabled=true (accessed on November 22, 2025).

[15] Ex. 7,
https://jobs.sap.com/search/?createNewAlert=false&q=&locationsearch=texas&optionsFacetsDD_department=&optionsFacetsDD_customfield3=&optionsFacetsDD_country=.



38.     SAP also purposefully targets Texas-based customers for its business planning and supply chain management services in competition with o9.   For example, SAP hosted its "Innovation Day for Supply Chain" event in Texas on September 17, 2025, where SAP executives, IT experts, business leaders, and partners attended presentations about "how SAP Supply Chain Management (SAP SCM) solutions leverage AI to transform companies with optimized processes,

strategic growth, and enhanced operational efficiency."[16]  As another example, SAP organized and hosted its "SAPInsider's S4 Summit in Dallas," discussing, among others, "Supply Chain Resilience and Sustainability," SAP's "development of BTP (Business Transformation Programs)," and "AI solutions for S/4HANA efficiencies."[17]

39.     SAP also provides business planning and supply chain management software and services, including its competing IBP platform using o9's trade secrets and confidential information, to customers with a significant presence in Texas, including, for example, Southwest Airlines (headquartered in Texas), Halliburton (headquartered in Texas), Dell (headquartered in Texas), Microsoft, IBM, and Cisco.[18]

40.     SAP also has sufficient minimum contacts with the State of Texas through its trade secret misappropriation activities jointly with and through Defendants de Barse, Zonneveld, and van Houten acting on SAP's behalf.  While the Individual Defendants were still employed by o9, SAP maintained close contact with them.

41.     SAP conspired with de Barse, Zonneveld, and van Houten to carry out mass downloads of o9's trade secrets and confidential materials, received o9's trade secret information at a minimum via van Houten and Zonneveld, and exploited the stolen information for its own benefit.  SAP knew and had reason to know that o9's trade secrets and confidential materials were

---

[16]   SAP Innovation Day for Supply Chain, Unlock Innovation and Optimize Efficiency in Operations, Wednesday, September 17, 2025, https://events.sap.com/us-sap-innovation-day-supply-chain-houston-2025/en_us/home.html (accessed on September 23, 2025).

[17]   Ex. 8, https://sapinsider.org/events/s4hana-summit-2023/; *see also* https://www.basistechnologies.com/sapinsiders4-summit-in-dallas-everything-you-need-to-know/ (accessed on November 23, 2025).

[18]   https://www.sap.com/about/customer-stories.html (search function accessed on November 23, 2025).

generated, managed, and stored in Texas, and SAP participated in the misappropriation scheme with the express purpose of targeting o9's U.S.-based, and specifically Texas-based, customers.

42.    The injuries and harms incurred by o9 because of Defendants' activities occurred and continue to occur in Texas where o9 is headquartered and where o9's customers are based. Defendants' conduct giving rise to this litigation was purposefully directed conduct towards Texas. Each Defendant knew or could reasonably foresee that their conduct would directly harm o9 and impact commerce within the state.

43.    In addition, this Court has personal jurisdiction over SAP SE, de Barse, Zonneveld, and van Houten each under Federal Rule of Civil Procedure 4(k)(2) because they are not subject to general personal jurisdiction in any state court, and they each have sufficient minimum contacts with the U.S. as a whole due to their respective substantial business in this Country for reasons discussed above.

**C.    Venue**

44.    Venue is proper as to SAP SE under 28 U.S.C. § 1391 (c)(3) because, among others, and for reasons discussed above, SAP SE is a foreign company and is subject to personal jurisdiction in this District.  Further, venue is proper as to SAP SE under 28 U.S.C. § 1391 (b)(2) because a substantial part of the events giving rise to o9's claims occurred in this District, as described above.   For example, the misappropriated trade secrets at issue are developed, created, and managed in o9's Dallas headquarters, and harm caused by SAP SE's misconduct to o9 was incurred in Dallas.

45.    Venue is proper as to SAP America under 28 U.S.C. § 1391(b)(2) and (c)(3) because, among others, and for reasons discussed above, SAP America is subject to personal jurisdiction in this District, it has conducted business in this District, and a substantial part of the events giving rise to o9's claims occurred in this District.  For example, the misappropriated trade

secrets at issue are developed, created, and managed in o9's Dallas headquarters, and harm caused by SAP America's misconduct to o9 was incurred in Dallas. SAP America has also invoked this Court's jurisdiction for intellectual property litigations. *See, e.g.*, *SAP America, Inc. v. Pedersen*, No. 22-cv-1534, Dkt. 1 (N.D. Tex. July 15, 2022) (declaratory judgment action against a Danish citizen); *SAP America, Inc. v. InvestPic, LLC*, No. 16-cv-2689 (N.D. Tex. Sept. 20, 2016).

46.     Venue is proper as to de Barse under 28 U.S.C. § 1391(b)(2) and (c)(3) because, among others, and for reasons discussed above, de Barse is a foreign resident subject to personal jurisdiction in this District, he has conducted business in this District, and a substantial part of the events giving rise to o9's claims occurred in this District. For example, the misappropriated trade secrets at issue are developed, created, and managed in o9's Dallas headquarters; de Barse entered into contracts at issue with o9 in this District; and harm to o9 caused by de Barse's misconduct was incurred in Dallas.

47.     Venue is proper as to van Houten under 28 U.S.C. § 1391(b)(2) and (c)(3) because, among others, and for reasons discussed above, van Houten is a foreign resident subject to personal jurisdiction in this District, he has conducted business in this District, and a substantial part of the events giving rise to o9's claims occurred in this District. For example, the misappropriated trade secrets at issue are developed, created, and managed in o9's Dallas headquarters; van Houten entered into contracts at issue with o9 in this District; and harms to o9 caused by van Houten's misconduct was incurred in Dallas.

48.     Venue is proper as to Zonneveld under 28 U.S.C. § 1391(b)(2) and (c)(3) because, among others, and for reasons discussed above, Zonneveld is a foreign resident subject to personal jurisdiction in this District, he has conducted business in this District, and a substantial part of the events giving rise to o9's claims occurred in this District. For example, the misappropriated trade

secrets at issue are developed, created, and managed in o9's Dallas headquarters; Zonneveld entered into contracts at issue with o9 in this District; and harm to o9 caused by Zonneveld's misconduct was incurred in Dallas.

## FACTUAL ALLEGATIONS

**A.      o9's Trade Secrets Are Critical to Its Business and Success**

49.      o9 is a global technology company recognized for its EKG-based cloud-native business planning and supply chain management solutions. Since its founding as a small, yet determined, start-up company in 2009, o9 has generated immense value for its clients worldwide and across numerous industries, including automotive, consumer packaged goods, energy & resources, high tech, industrial manufacturing, life sciences, retail, and telecom.

50.      o9's premier Digital Brain platform was introduced in 2014 as a next-generation alternative to legacy business planning solutions that were traditionally siloed across different parts of a business.   In contrast with these legacy solutions, o9's Digital Brain platform leverages advanced artificial intelligence, machine learning, and cloud technology to integrate and analyze data across business segments, resulting in comprehensive end-to-end enterprise decision-making capabilities.   Core capabilities offered by o9's Digital Brain platform include demand planning, integrated business planning, supply chain planning, retail planning, revenue growth management, and more.

51.      o9's innovative Digital Brain platform provides these capabilities through its Enterprise Knowledge Graph/EKG and AI/ML capabilities.   EKG provides digital models of data and knowledge to enable real-time propagation of changes across an enterprise.   One of its key features is its cloud-native architecture, which allows for the integration of what would otherwise be scattered data across different business segments to provide a unified representation of an entire business, including products, customers, transactions, and supply chains.

52.     o9's Digital Brain platform utilizes AI/ML capabilities to process and analyze the unified data model provided by EKG and ultimately deliver customized business planning solutions that address a business's unique needs.  For example, because o9's Digital Brain platform integrates data from commercial, financial, and supply chain planning teams and creates a unified graph-based model of the entire end-to-end business, o9's embedded AI/ML capabilities enable businesses to efficiently obtain holistic, real-time, and actionable insights into core strategic and tactical questions relating to their specific integrated planning, supply chain, and commercial operations, including, for example:

- If demand increased by 20% in Q3, can the business support this new demand, and at what cost?

- If my supplier is disrupted and cannot deliver for the next two weeks, which of my customers will be impacted, and how can we shape our demand so that our most important customers will get their products?

- I have a limited supply and need to make an allocation decision between two customers based on their forecasted demand. How do I allocate between these two customers based on which customer has a history of providing more accurate demand forecasts (and is therefore less likely to be overestimating)?

53.     o9 has pioneered the modernization of business planning solutions, pressuring incumbent competitors into developing competing real-time, AI-driven, integrated-planning capabilities.  o9 disrupted the landscape of business planning technologies by investing heavily into its engineering and business teams' development and implementation of its innovative Digital Brain platform and its unique client-specific business planning solutions.  Among others, o9's trade secrets cover: (1) o9's design, architecture, implementation, and methodology (and the development, testing, and implementation thereof) for its core Digital Brain platform and related technologies; (2) o9's products and solutions roadmap; (3) o9's client-specific capabilities, solutions, and test cases; (4) o9's sales and marketing strategies; (5) o9's customer lists and

customer intelligence; (6) o9's business and partnership proposals; (7) o9's competitive intelligence; and (8) o9's financial information. These trade secrets encompass hundreds, if not thousands, of documents, files, software, and other materials in various formats and stored across multiple media.

54.    By way of non-limiting examples, o9's trade secrets include the following materials and documents, which are marked as "confidential and proprietary" to o9.

| Exemplary Category of o9's Trade Secrets | Exemplary o9 Trade Secrets and Confidential Information |
| --- | --- |
| (1) o9's design, architecture, implementation, and methodology (and the development, testing, and implementation thereof) for its core Digital Brain platform and related technologies | • o9 Platform Integration Pipeline (providing explanations on how o9's platform processes data at different stages including data qualification, validation, digestion, etc.).<br><br>• Bias_Outlier Correction & Forecast Error Calculation (detailing the process of how o9 processes data to address bias, outlier, and forecast error corrections)<br><br>• O9 Demand Planning - Forecasting Reference (detailing o9's various forecasting approaches, principles, and algorithms)<br><br>• Building Block Capabilities and Features v20250305 (detailing o9's current and future capabilities and features, customer requirements, and timelines)<br><br>• Integrated Order Promising Solution Design Document (detailing o9's implementation and design of supply chain planning capabilities for build-to-stock companies, including integrated order promising, and o9's best practices relating thereto)<br><br>• Integrated Order Promising Solution Introduction Deck (detailing o9's implementation and design of supply chain planning capabilities including core solutions o9 offers and process for providing such solutions)<br><br>• Supply_Planning_Solution_Design_Document (detailing o9's implementation and design of supply chain planning capabilities for consumer packaged goods customers, including diagrams, figures, schematics, and other technical details) |
| (2) o9's products and solutions roadmap | • 2024H1 Platform Roadmap (detailing o9's strategic position in the next 3-5 years, including roadmaps for o9's upcoming product features) |

| Exemplary Category of o9's Trade Secrets | Exemplary o9 Trade Secrets and Confidential Information |
|---|---|
| | • R2025 SP Roadmaps (detailing the roadmap for o9's supply chain planning products and solutions, including the capabilities and features for future releases) |
| (3) o9's client-specific capabilities, solutions, and test cases | • 202312 Henkel Adhesives x o9 Demand Planning - Use cases (detailing o9's client-specific project strategies, including its proposed solutions, designs, and implementation)<br><br>• 202312 Henkel Adhesives x o9 Supply Planning - Use cases (detailing o9's client-specific project strategies, including its proposed solutions, designs, and implementation)<br><br>• Supply specifics (detailing o9's client-specific project strategies, including its proposed solutions, designs, and implementation)<br><br>• Supply Specifics V2 (detailing o9's client-specific project strategies, e.g proposed solutions, designs, and implementation)<br><br>• o9 x ["Customer C"] - Test Drive Spec (detailing o9's client-specific project strategies, including its proposed solutions, designs, and implementation)<br><br>• ["Customer P"] o9-JDA-SAP-EndtoEndDesign (detailing o9's client-specific project strategies, including its proposed solutions, designs, and implementation) |
| (4) o9's sales and marketing strategies | • Playbook_Solution Consulting (detailing o9's sales and marketing strategies, sales model, best practices, strategies on how to prepare client demos and storytelling)<br><br>• QBR Product Strategy Update (including details of marketing and sales strategies for o9's products, roadmaps, sales and delivery goals and targets, and selected customer lists)<br><br>• EKG Solutions_15jdSfyE5BC0MdMovrO-2_ElzwQWEF5z_3nWPY--I3b0.docx (detailing key features of o9's Enterprise Knowledge Graph solution, as well as the problems the solution solved)<br><br>• ["Customer G"] x o9 Strategy Workshop - Apr 2025.pdf (detailing o9's client-specific sales and marketing presentation, including o9's value proposition regarding its key proposed capabilities)<br><br>• ["Prospect B"] – Post Game.pdf (detailing o9's client-specific sales and marketing strategy, including key meetings, events, insights, learnings, and feedback relating to the sales opportunity) |

| Exemplary Category of o9's Trade Secrets | Exemplary o9 Trade Secrets and Confidential Information |
|---|---|
| (5) o9's customer list and customer intelligence | • Copy of Client Master Data // Last Updated 2025.02.26 // ServicesOps Internal Version Only (o9's client list, including project start and end dates, scope of work details, contact information, and other details) <br><br> • o9 Client-Specific 360 and Account Plans (o9's customer intelligence analyses for individual customers, including customer business plans, key demand points, and other considerations) |
| (6) o9's business and partnership proposals | • 20240423_["Customer L"] NGP RFP Orals_v2_1-9CejunYHJITLcfv88NU8UiHOEQs4ElU.pptx (o9's client-specific RFP proposals with detailed explanations of o9's competitive advantages, product offerings, customer success stories, product roadmaps, and delivery capacities) <br><br> • 20231113_["Customer O"]_o9_RFI_vS (o9's client-specific business proposal detailing o9's product architecture, proposed capabilities, implementation plan, and R&D roadmap) <br><br> • ["Prospect B"] Demand Planning Solution RFP Guidelines (detailing o9's client-specific proposed demand planning solution, including its proposed implementation approach) <br><br> • [02_RFP_ NGP_Editor_General Specifications_Software APS] 02_RFP_ NGP_Editor_General Specifications_Software APS (detailing o9's client-specific next gen planning project proposals, including project design, planning, and implementation) |
| (7) o9's competitive intelligence (including internal market research and competitor deep dives) | • o9 vs SAP IBP Key Differentiators Master (detailing o9's competitive positioning against SAP) <br><br> • Industry Knowledge_Capital Goods POV (detailing o9's competitive positioning in supply chain planning within industry for capital goods, including its advantages and challenges) <br><br> • Forecasting cases deep dive 3 (detailing o9's competitive analysis of o9's forecasting capabilities, including case studies) |
| (8) o9's financial information | • 02_o9 Deal Sheet - Apr 2025 - ["Customer P"] - Assortment optimization_vRevised (detailing o9's client-specific deal sheet, including costs, rates, deal structure, and other information) |

55. As detailed below, Defendants misappropriated each category of the above-referenced o9 trade secrets, including the exemplary files and thousands of other o9's trade secrets

and confidential files (collectively, "**o9's Misappropriated Trade Secrets**"), without authorization. Defendants used one or more of o9's Misappropriated Trade Secrets in connection with SAP's business planning and supply chain management solutions, including its IBP offerings.

56.    o9's trade secrets result from its significant investments and are valuable in driving o9's success and competitive position in the market. Competitors in possession of o9's trade secrets would have a competitive advantage over o9, including because they would acquire confidential knowledge of o9's product development strategies, o9's technical implementation details, and o9's actual and proposed implementation of client-specific business planning and supply chain management solutions.

57.    o9's innovative Digital Brain platform has positioned o9 as one of the fastest growing business planning solutions companies worldwide. The breadth of these trade secrets would enrich competitors with an understanding of at least o9's strategic vision, o9's Digital Brain platform's functionalities and capabilities, and o9's scope of work for prospective and actual clients, informing their product and sales strategies and allowing them to uncut o9 out of any competitive opportunity. For example, because o9's core business model relies on customized client-specific business planning solutions, understanding the capabilities and solutions offered by o9's Digital Brain platform, how they are uniquely designed to meet the specific needs of clients, and how successful they are in meeting those needs would be immensely valuable to competitors seeking to not only develop and adapt similar technology, but also compete for overlapping clients.

58.    o9's substantial investments and developments in trade secrets and technologies have generated real value for o9's clients worldwide and across all industries. o9's growth speaks for itself—the company reached a valuation of $1 billion by 2020, which increased to $3.5 billion by 2023. In Q1 2021, o9 reported over 121% year-over-year (YoY) growth in software bookings,

driven almost entirely by new logo additions across industrial manufacturing, retail, apparel, consumer packaged goods, and food and beverage industries. In 2021, o9 reported a more than threefold increase in YoY Annual Recurring Revenue ("ARR") from new clients. In 2022, o9 was named a "Leader" in the 2022 Gartner Magic Quadrant for Supply Chain Planning Solutions.[19] o9 also reported that, by the end of 2022, its ARR had grown over 84% compared to the prior year, with 74 go-lives across major global brands.

59.    o9 has maintained its continuing growth, reporting a 47% year-over-year ARR increase in 2023, 37% year-over-year growth in subscription revenue in 2024, and a 60% year-over-year growth in new clients added in the Q1 of 2025. As of today, o9 has over 200 customers across a wide range of industries, including technology and computer hardware, oil and gas, retail, consumer electronics, consumer packaged goods, automotive suppliers, food and beverage, cosmetics, and others.

**B.    o9 Deploys Substantial Measures to Protect Its Trade Secrets**

60.    o9 takes extensive measures to protect the confidentiality and secrecy of its trade secrets, including those at issue in this action. o9 has acted reasonably and diligently to protect such information.

61.    o9 requires non-disclosure and confidentiality agreements with o9's suppliers, vendors, contractors, and other third-parties before providing access to o9's trade secrets and implements policies concerning o9's standard information classification system, including how files are to be assessed and designated as confidential.

---

[19] https://o9solutions.com/news/o9-solutions-named-a-leader-in-gartners-2022-magic-quadrant-for-supply-chain-planning-solutions?utm_campaign=PR.Awards&utm_medium=linkedin_o9&utm_source=marketing_social (accessed on November 23, 2025).

62. Further, o9 uses encryption, password protection, and device authentication, among many other measures, and maintains high standards relating thereto, restricts access to its file repositories on a need-to-know basis, and uses locked buildings, security cameras, guards, and other measures to control access to its physical facilities. o9 further restricts physical access to its buildings within the company, where access to certain buildings or portions of buildings may be limited depending on an employee's role at the company.

63. o9 further enters into agreements with employees that provide detailed confidentiality obligations to o9. Among others, these agreements provide the definitions of what constitutes o9 confidential and proprietary information, the obligations of o9 employees to maintain the confidentiality of such materials and information, and the obligations of employees to return company property at the termination of employment, as detailed below.

64. o9 employees, including Defendants de Barse, Zonneveld, and van Houten, are required to sign the Employment Contracts, prior to commencing o9 employment, where employees must sign and attest that:

Article 9. Employer Property

All items of property that the Employer has made available to the Employee are and remain the Employer's property. All items the Employer has made available to the Employee must be immediately returned to the Employer, upon Employer's request thereto. The Employee shall not use these items for private purposes, unless the Employer has given prior written consent.

***

Article 13. Non-Disclosure

The Employee undertakes both during and after the term of the Employment Contract not to disclose to third parties in any way whatsoever any particulars relating to the business of the Employer or any company economically or organisationally affiliated with the Employer which he/she knows or may suspect could harm the interests of the Employer and/or those affiliated companies. These obligations also apply to any matters concerning the Employer or relations of the Employer or the Employer's affiliates.

\*\*\*

6. The Employee agrees:

    a. To give the Employer full written details of all such intellectual property promptly following its creation;

    b. At the Employer's or Group Company's first request and in any event upon the termination of his employment to give the Employer all originals and copies of correspondence, documents, papers and records on all media which record or relate to any intellectual property;

    c. Not to attempt to register any intellectual property unless requested to do so in writing by the Employer or any Group Company;

    d. \to keep confidential all intellectual property issues unless the Employer of any Group Company has consented in writing to disclosure by the Employee; and

    e. Not to use the intellectual property of the ensuing results (including but not limited to the documents in which they are recorded) during his employment under this employment agreement nor after its termination, for his own use or for any purpose other than the performance of the work under this employment.

65.    Additionally, o9 distributes Employee Handbooks to employees that reiterate o9 employees' non-disclosure obligations:

    The protection of confidential business information and trade secrets is vital to the interests and success of o9. All employees shall comply with the Intellectual Property and Non-Disclosure clauses as stipulated in the employment contract and/or renewed during the employment. Employees who improperly use or disclose confidential business information or trade secrets will be subject to disciplinary action, up to and including termination of employment, and may be subject to further legal action, even if they do not actually benefit from the disclosed information.

    In order to keep our competitive advantage and uphold our reputation, we protect our intellectual property rights. All employees should be aware of and protect our intellectual property rights and respect the intellectual property rights of third parties. Talk to the legal department if you have any questions regarding the confidentiality status of information and/or regarding intellectual property rights.

66.    When employees depart from o9, o9 follows termination procedures to protect its confidential and proprietary information, including requiring employees to return o9 devices, laptops, mobile devices, and other o9 property, and restricting access to database exchange systems, collaboration systems, and file repositories. o9 employees are also reminded that they

remain bound to their confidentiality obligations even after termination.  For example, o9 issued de Barse a letter reminding him about his confidentiality obligations and the consequences in the event these obligations are breached.

67.    Due to o9's security measures and other efforts to maintain the confidentiality of its trade secrets, o9's trade secrets, including those misappropriated by Defendants, are not available to the public or to o9's competitors through legitimate means.

### C.    SAP Is Competing with o9 in the Market for AI-Based Supply Chain Management Solution

68.    Founded in 1972, SAP is a multinational enterprise with more than 110,000 employees worldwide.   Today, SAP is the world's largest vendor of enterprise resource planning (ERP) software.  SAP's flagship ERP offering, SAP S/4HANA, is broadly adopted by large enterprises.  Although headquartered in Germany, SAP has a significant presence in the United States.  According to SAP's 2024 Integrated Report, "40% of [SAP's] total revenue was generated in the Americas region (2023:41%)," and "[t]otal revenue in the Americas region increased 8% to €13,808 million (2023: €12,762 million)."[20]

69.    One key aspect of SAP's ERP offerings includes business planning and supply chain management solutions.  For example, in or around 2000, SAP launched the first generation of its business planning and supply chain management solution, SAP Advanced Planning and Optimization ("APO").  Key features offered by SAP APO solution include demand planning (DP), supply network planning (SNP), production planning and detailed scheduling (PP/DS), global available-to-promise, and certain later developed features. SAP APO relies on traditional

---

[20]    https://www.sap.com/integrated-reports/2024/en.html, at 74 (accessed on November 23, 2025).

enterprise database infrastructures, offering limited data integration and real-time analytical capacity and visibility.

70.    In 2014, SAP launched its next-generation business planning and supply chain management solution, SAP Integrated Business Planning ("IBP"), which is designed to replace SAP APO by providing more advanced business planning capabilities, including forecasting and demand management, response and supply planning, sales and operations planning features.

71.    While SAP encourages its APO customers to migrate to SAP IBP, the market has demonstrated significant resistance and hesitation to doing so.  For example, commentators have noted several main reasons why current APO customers are not willing to migrate, such as "[l]ack of customer confidence in S/4HANA (the replacement platform)," "[l]engthy reimplementation project needed (12–18 months) from APO to S/4HANA," "[h]uge investment needed in licenses and consulting (see point above)," "[l]ack of functionality S/4HANA compared to SAP APO," "[p]oor support for existing customisations," and "[l]ack of use cases (too little customers that moved from SAP APO to S/4HANA)."[21]

72.    Indeed, SAP has repeatedly delayed its plans to end support for its older APO platform multiple times.  SAP originally announced that it had planned to end support of APO in 2017, but since then, that end-of-life date has been pushed back multiple times.  In February 2020, SAP disclosed its plan to end the maintenance for its SAP APO solution by 2027, citing SAP customers' "demand for choice."[22]

---

[21]    Ex. 9, https://planadigm.com/knowledge/end-of-life-sap-apo-by-2027/; *see also* https://www.bizbraintech.com/news-blog/sap-ibp-vs-apo-is-replacement-possible-and-if-so-how (identifying disparity in features offered by SAP APO and SAP IBP).

[22]    Ex. 10, https://support.sap.com/en/release-upgrade-maintenance/maintenance-information/maintenance-strategy/s4hana-business-suite7.html ("SAP will provide mainstream maintenance until end of 2027 for SAP Business Suite 7 core applications"); *see*

73.    Commentators have also noted that SAP has not provided any automated or standardized migration tools to support transitions from SAP APO to SAP IBP, which significantly contributes to customer hesitation.  Unlike a traditional software upgrade, the migration involves rebuilding core planning processes, reconfiguring data models, and retraining users—effectively making it a new implementation rather than a simple conversion.  Industry analyses emphasize that companies must manually redesign planning workflows, transfer master data through bespoke integration setups, and validate functionality from scratch, leading to higher costs, longer timelines, and increased operational risk.  As TeamWork notes, "[t]here are no tools to migrate from SAP APO to SAP IBP," making the process inherently complex and resource intensive.[23]

74.    In light of these concerns and deficiencies, many SAP APO customers chose to explore different options for supply chain management solutions.  Meanwhile, o9—with its advanced artificial intelligence, machine learning, and cloud technology to integrate and analyze data across business segments—has quickly increased its market share in the advanced supply chain management solution space.  Unlike SAP APO or SAP IBP solutions, o9 provides a robust AI-powered and cloud-native end-to-end offering that can support an enterprise's key planning processes using a single data model across different levels of granularity.  o9's Digital Brain platform further provides users with intuitive and modern UI and UX, an array of AI/ML- data models informed by thousands of data sources, and a flexible architecture that can integrate external solvers.

---

*also* https://news.sap.com/2020/02/sap-s4hana-maintenance-2040-clarity-choice-sap-business-suite-7/ (accessed on November 23, 2025).

[23]    https://www.teamwork.net/en/migrate-sap-apo-to-sap-ibp/  (accessed on November 23, 2025).

**D.      SAP Misappropriated o9's Trade Secrets and Confidential Information Through Former o9 Employees Including the Individual Defendants**

75.      To attempt to regain its dominance in the advanced supply chain management and general enterprise resources planning market, SAP launched a campaign to gain trade secret materials and confidential information that o9 has developed over the years.

76.      As part of that campaign, since no later than last year, SAP began approaching and recruiting the top leadership of o9's sales and marketing team.    As of November 2024, SAP's Chief Operating Officer had extensive communications with de Barse, o9's then-Chief Revenue Officer.  SAP also met with other o9 executives and high-level officials who worked closely with de Barse, including Zonneveld and van Houten.

77.      At o9, de Barse was responsible for managing o9's global business development, marketing, and sales activities, and played a significant role in pursuing and obtaining many of o9's major customers.  By the time de Barse left o9 in February 2025, over thirty o9's management leaders (and hundreds of employees under their leadership) reported to de Barse, including Zonneveld, van Houten, and other product, sales, and marketing executives.  As the leader of o9's global sales and marketing, de Barse had access to o9's trade secrets and confidential information such as customer lists, market intelligence, business plans, product roadmaps, demand and pricing strategies, and financial data.  De Barse also had access to o9's technical information, such as technical specifications, customer test cases, product design, and product implementation.

78.      In addition to maintaining contact and relationships with o9 customers, de Barse understood o9 and SAP to be head-to-head competitors in the market for business planning and supply chain management solutions.  He was involved in and led o9's marketing strategies and campaigns in direct competition with SAP over the years and therefore had a deep understanding of the competitive advantages of o9 over SAP in connection with their respective IBP offerings.

Disclosure of any of o9's trade secrets and confidential information to SAP can and will cause significant harm to o9.

79.    As Global Senior Vice President, Zonneveld was responsible for driving o9's global business development, working with de Barse and other sales and marketing executives to design, implement, and execute o9's confidential sales and marketing strategies.  Zonneveld oversaw his own team comprising at least ten business development representatives and account executives and helped secure some of o9's major clients across numerous industries.[24]

80.    As Senior Vice President and Knowledge Innovation Lead, van Houten supervised o9's Knowledge and Innovation team, which worked closely with o9's senior leadership in designing, implementing, and communicating o9's confidential strategies and materials relating to competitive intelligence, product messaging, product roadmaps, client account plans, client use cases, and o9's overall value proposition.  o9's Knowledge and Innovation team was also responsible for supporting o9's sales and marketing efforts by leveraging their knowledge of o9's capabilities and solutions to advise clients on how o9 can solve their business challenges.  o9's Knowledge and Innovation team served as the liaison between o9's product and sales teams, developing and communicating strategies to address sales constraints and ensuring alignment between the two teams.

81.    De Barse, Zonneveld, and van Houten worked closely with each other.  Zonneveld and van Houten directly reported to de Barse. All three worked on projects, conducted client pitches, and attended client meetings and other conferences together.  They are so close that they described themselves as "work wives" of each other.

---

[24]    Ex. 2 (Zonneveld LinkedIn).

82.     Between November 2024 and de Barse's departure from o9 in February 2025, senior SAP executives and de Barse had numerous in-person and telephonic conversations, including:

- November 25, 2024: de Barse sent an email to Sebastian Steinhaeuser (SAP's *Chief Operating Officer and Executive Board member*) regarding "Sync – Stephan de Barse / Sebastian Steinhauser"

- January 14, 2025: de Barse received a LinkedIn message from SAP executives including Peter Bickenbach, after de Barse had visited SAP SE's headquarters in Walldorf, Germany.

- February 4, 2025: de Barse emailed regarding "Alignment Henkel" with Jasmin Wasinger [(SAP *Supply Chain Customer Office)*], Dominik Metzger (SAP *Supply Chain Management President*), and Johannes Heydt (SAP *Managing Partner*).

- February 5-6, 2025: de Barse received a calendar invite with the subject "Breakfast @Hilton" from Adriana Aroulho (SAP *Latin America President*).

- February 14, 2025: de Barse attended an onboarding meeting with McKinsey relating to his SAP employment.

- February 20, 2025: de Barse exchanged emails with Stephan Kreipl (SAP *IBP Head of Product Management*).

83.     De Barse, Zonneveld, and van Houten purposefully concealed their communications with SAP prior to their departure from o9, including by deleting records of their emails, phone calls, in-person meetings, and other communications and correspondence with SAP.

84.     On January 3, 2025, de Barse informed Chakri Gottemukkala, o9's co-founder and Chief Executive Officer, and Igor Rikalo, o9's President and Chief Operating Officer, that he would be formally resigning from o9.  De Barse, however, did not immediately disclose the identity of his new employer.  De Barse's last day at o9 was February 28, 2025, and he joined SAP within a month, in March 2025, as President of SAP's Global Business Suite.  At SAP, de Barse

leads "the global Go-to-Market, Strategy, and Execution" of SAP's integrated portfolio of applications, data, and AI solutions worldwide.[25]

85.    De Barse and SAP actively solicited Zonneveld and van Houten to join SAP, and they planned their coordinated departure from o9.  For instance, between January and February 2025, around the time when de Barse formally resigned and left o9, Zonneveld received SAP's business overview materials and had access to de Barse's SAP onboarding materials.  Further, in February 2025, both de Barse and Zonneveld had meetings with SAP executives regarding positions in SAP's Global Business Suite.

86.    Zonneveld and van Houten both left o9 on May 30, 2025, and joined SAP at the same time in June 2025.  Van Houten serves as Chief Product Officer for SAP's Supply Chain Management Planning group and is responsible for "help[ing] customers adopt SAP's [IBP] applications."[26]  Zonneveld serves as SAP's "Chief Revenue Officer Procurement," responsible for the "go-to-market for SAP's Procurement solutions."[27]

87.    De Barse, Zonneveld, and van Houten jointly and separately solicited other o9 employees to join SAP.  SAP targeted specific o9 employees who had close relationships with de Barse, Zonneveld, and van Houten and recruited them for positions in SAP's Global Business Suite.  For example, SAP has successfully recruited a former o9 employee on behalf of de Barse, including by contacting them during their employment at o9:[28]

---

[25]  Ex. 1 (De Barse LinkedIn).

[26]  Ex. 3 (van Houten LinkedIn).

[27]  Ex. 2 (Zonneveld LinkedIn).

[28]  Ex. 11 (May 30, 2025, email from Tammi Hall to Karolina (Tuttle) Bombardelli).

Hi Karolina,

I'm working with Stephan de Barse, our new President of Global Business Suite at SAP. We're anticipating a new confidential global leadership role in support of our Business Network solution.

Would you be open to a brief, confidential call to discuss it in more detail?

Tammi
tammi.canoose.hall@sap.com

tammi.canoose.hall@sap.com

88.     Since 2025, at least eight other o9 employees who worked closely with de Barse, Zonneveld, and van Houten left for SAP, including Abhishek Sahay, Koen Jacobs, Daria Iatmanova, Stefan IJfs, Karolina Tuttle Bombardelli, Ablo Traore, Jan-Luca Jaborek, and Mark Norbruis.  Each of the former o9 employees known to have joined SAP had reported directly to de Barse while they were all employed by o9.  Defendants are still actively soliciting and recruiting additional o9 employees.

89.     As a critical step of SAP's overall campaign in the attempt to acquire o9's trade secrets and confidential information, SAP leveraged the positions of de Barse, Zonneveld, and van Houten at o9 to access and acquire o9's trade secrets and other confidential information by encouraging, soliciting, and conspiring with de Barse, Zonneveld, and van Houten to mass download and improperly acquire significant volumes of o9's trade secrets and confidential materials prior to their departures from o9.

90.     Between December 6, 2024 and April 30, 2025, when van Houten and Zonneveld formally provided o9 with notice of their resignations, both of them downloaded an inexplicably large number of confidential o9 files, much of which, if not all, was completely detached from any legitimate o9 business purpose.  Specifically, van Houten downloaded at least ***16,055 files***, 15,344 of which were downloaded across ***just seven days*** (December 30, 2024, and January 1, January

15, March 7, March 19, March 24, and March 31, 2025). Zonneveld downloaded at least ***5,804 files***, 5,485 of which were downloaded across ***just six days*** (January 3, January 31, February 13, February 27, March 28, and April 18, 2025). The volume of downloads far exceeded any of their ordinary business needs (or the needs of any similarly situated employee).

91.    These files downloaded by van Houten and Zonneveld included o9's Misappropriated Trade Secrets spanning virtually every aspect of o9's business, including (1) o9's design, architecture, implementation, and methodology (and the development, testing, and implementation thereof) for its core Digital Brain platform and related technologies; (2) o9's products and solutions roadmap; (3) o9's client-specific capabilities and solutions and test cases; (4) o9's sales and marketing strategies; (5) o9's customer lists and customer intelligence; (6) o9's business and partnership proposals; (7) o9's competitive intelligence; and (8) o9's financial information.

92.    Defendants' mass downloading and trade secret misappropriation activities were well coordinated. Within the week leading up to de Barse's resignation on January 3, de Barse met with van Houten and Zonneveld, and under de Barse's direction, the two undertook to download overwhelmingly large tranches of confidential o9 files.

93.    For example, on December 30, 2024, de Barse and van Houten met for breakfast. On that same day, van Houten downloaded ***9,892 files***. Two days later, on New Year's Day, van Houten continued the mass downloading spree, downloading ***2,690 files***. Notably, van Houten made the effort to mass download files when he was on paid time off ("PTO").

94.    Similarly, on December 30, 2024, Zonneveld sent a "test" email to his personal email. The following day, on New Year's Eve, Zonneveld sent himself an email with the subject line "Download Spullen" which translates to "Download Stuff." After the testing, Zonneveld

downloaded *1,293 files* from o9's shared drives on January 3, 2025, the date of de Barse's resignation.

95.    Their download activities were highly unusual and extraordinary.  Between December 6, 2024 and December 29, 2025, van Houten averaged *about 5 downloads per day*, a far cry from the *thousands* of files he downloaded across just two days.  It was particularly uncharacteristic for Zonneveld to download any files at all, considering that he averaged *less than 1 download per day* between December 6 and December 31, 2024, with a total of *just 12 downloads*.

96.    The downloads did not stop here, however.  Between January 2 and April 30, 2025, van Houten downloaded 3,365 files, of which 2,764 were downloaded across *just five days*.  As demonstrated below, the bulk of these downloads was concentrated in March 2025, about a month before van Houten resigned from o9.

- January 15, 2025: 334 files.

- March 7, 2025: 363 files.

- March 19, 2025: 1,732 files.

- March 24, 2025: 201 files.

- March 31, 2025: 134 files.

97.    Between January 4, 2025 and April 30, 2025, Zonneveld downloaded 4,499 files, 4,192 of which were downloaded across *just five days* as shown below:

- January 31, 2025: 532 files.

- February 13, 2025: 1,036 files.

- February 27, 2025: 431 files.

- March 28, 2025: 1,986 files.

- April 18, 2025: 207 files.

98.     In addition to mass downloading, Individual Defendants purposefully compiled and organized critical o9 trade secret and confidential materials and transmitted o9's trade secrets to SAP.  For instance, on around February 19, 2025, Zonneveld met with SAP Chief Revenue Officer Peter Graulich.  On the same day, Zonneveld created and/or copied o9-client-specific folders titled by specific customer names, such as "[Company C]," "[Company D]," "[Henkel]," "[Company L]," "[Company M]," "[Company N]," "[Company P]," and more.  These folders contained information and files Zonneveld had mass downloaded since de Bares's resignation from o9, including a significant number of files relating to o9's architecture and implementation details and o9's work with the above-referenced clients.

99.     A few weeks later, on or around March 7, 2025, Zonneveld met with Graulich again in Atlanta.  Shortly after this meeting, Zonneveld created over 80 folders on his o9-issued Google account and named them by o9's customer names.  On information and belief, Zonneveld copied these folders from the shared drives of o9's sales team and shared them with SAP.  Zonneveld did not create or organize his client files as part of his prior regular business practices.

100.     In addition, on at least three occasions, Zonneveld emailed confidential o9 materials to his personal email account.  For example, on February 28, 2025, Zonneveld forwarded himself an email regarding "Fwd: [Prospect B] Sales Cycle Post-game PPT," attaching a file titled "[Prospect B] – Post Game.pdf" which details o9's client-specific sales strategies and related discussions.

101.     As another example, on January 31, 2025, Zonneveld downloaded over 530 files, at least 300 of which concern o9's client Henkel.  On February 4, 2025, just four days later, and after the weekend, de Barse exchanged emails with SAP's leadership team regarding "Alignment Henkel."   The timing and nature of these events demonstrate that a coordinated effort to

misappropriate o9's trade secrets had already been taking place. A few months later, on August 12, 2025, de Barse reposted an article on behalf of SAP titled "Henkel Partners with SAP to Implement AI-Assisted Returns and Exchanges Management Process" on LinkedIn, stating "What an exciting announcement about Henkel, an SAP Business Suite customer and global leader in adhesive technologies and consumer brands, and SAP developing a custom AI-powered solution that streamlines and enhances the returns and exchanges process."[29] AI-powered supply planning solutions are exactly the kinds of solutions that o9 had been developing for its clients, including Henkel.

102.    Individual Defendants not only misappropriated o9's trade secrets and confidential materials but also purposefully deleted and altered thousands of the files at issue (*e.g.*, o9's trade secrets misappropriated by Individual Defendants and their communications with SAP) from o9's systems in an attempt to conceal their unlawful activities. On February 19, 2025, Zonneveld wiped all 107 folders he had created after he met with SAP's Peter Graulich, making it difficult to discern what files Zonneveld had been collecting and/or sharing. Zonneveld further deleted the document containing his notes on what he discussed with SAP's Peter Graulich ("2025-03 | Pre-Read Peter & Sean | Atlanta meeting – March 2025").

103.    As another example, on April 30, 2025, the date of his resignation, and before turning in his laptop to o9, Zonneveld personally wiped all documents and folders saved on his o9-issued personal Google account, deleting over 11,373 documents and 1,312 private folders containing o9 files, including confidential o9 materials. As provided by o9's company policies and Zonneveld's contractual obligations to preserve o9's records, Zonneveld understood or should

---

[29] Ex. 12, https://www.linkedin.com/posts/stephandebarse-driving-digital-transformation_sap-henkel-artificialintelligence-activity-7363574195575758853-MsXO.

have understood that all of o9's business documents and records, including those he kept in his "private" folders, constituted o9's property, and that he was not permitted to destroy any of these business documents or records. Zonneveld nevertheless mass deleted these folders containing o9 property, including folders named "o9 features," "SAP," "SAP IBP vs. o9," "APO replacement," "Pricing Model and FAQ," "Architecture," and "o9 process flows," rendering it difficult or impossible for o9 to determine the full extent of o9's files that were misappropriated by Zonneveld.

104.    Zonneveld's systematic collection of o9's business, technical, and client-specific documents, concurrent meetings with SAP executives, and later mass deletion of downloaded o9 materials and materials relating to his interactions with SAP, and the timeline of his activities in light of the resignations of de Barse and Van Houten demonstrate a calculated scheme to steal o9's trade secrets and confidential information and conceal the misappropriation.

**E.    SAP Used Misappropriated o9 Trade Secrets and Confidential Information to Undermine o9's Competitive Positioning**

105.    o9's trade secrets and confidential materials, including those contained in the files downloaded by Zonneveld and van Houten, provide extensive insights into how o9 positions and defines its Digital Brain platform in the marketplace, which capabilities o9 offers or plans to offer, and how o9 designs, tests, and implements these capabilities. These trade secrets and confidential information also include o9's actual and prospective clients, the client-specific business planning challenges that o9 was brought to address, and o9's proposed business planning solutions, their use cases, and their implementation strategies.

106.    SAP will be sunsetting SAP APO in favor of SAP IBP by 2027, less than two years from now. Although the window of opportunity to generate customer buy-in for SAP IBP is closing, by being in possession of o9's Misappropriated Trade Secrets, SAP is to inform its product development roadmap for competing business planning capabilities, as well as its sales and

marketing strategies, in a way that will massively undercut o9's competitiveness in any future business opportunity.

107.    Indeed, Defendants used and will continue to use o9's trade secrets and confidential information to solicit overlapping clients.  Since de Barse started his employment at SAP, many public articles have discussed partnerships between SAP and clients with whom o9 has prior business relationships.[30]  As detailed above, Zonneveld and van Houten downloaded confidential o9 files relating to o9's business discussions with each of these clients prior to their departure. SAP has hired these former o9 employees into similar roles relating to SAP's competing products, namely SAP's AI-based business planning and supply chain planning solutions.

108.    Further, o9's Digital Brain platform and EKG are well-recognized as the core of o9's innovative, AI-driven business planning offering.  o9 has been using the terms "Digital Brain" and "Enterprise Knowledge Graph" and marketed these features in connection with its solutions since 2014 and 2018, respectively.  Over the past year, while recruiting and having ongoing conversations with o9's senior leadership, SAP began using the exact same **terms and features** of o9 products in SAP's marketing materials and product descriptions to position its IBP offerings as a direct competitor to o9, which reflects o9's trade secrets and confidential information.

109.    Specifically, in October 2024, around the same time or shortly before SAP began approaching o9's senior sales executives, SAP announced its plan to launch "SAP Knowledge

---

[30]    *E.g.* https://www.sap.com/assetdetail/2025/02/12b92326-f37e-0010-bca6-c68f7e60039b.html (February 2025); https://news.sap.com/2025/08/henkel-sap-to-implement-ai-assisted-returns-and-exchanges-management-process/ (August 12, 2025); https://www.forbes.com/sites/sap/2025/08/06/inside-pepsicos-supply-chain-transformation/ (August 6, 2025); https://www.microsoft.com/en/customers/story/25308-loreal-power-apps (March 2025); https://community.sap.com/t5/sap-successfactors-events/sap-successfactors-customer-conversations-with-danone/ev-p/14221630 (October 13, 2025); *see also* https://www.sap.com/assetdetail/2025/05/506063e9-0a7f-0010-bca6-c68f7e60039b.html (May 2025).

Graph" in Q1 of 2025 to support its AI business planning capabilities.[31]  To distinguish itself from the traditional concept of "knowledge graph," SAP emphasized that its new offering would "serve as a data fabric, tying together disparate systems and enabling more holistic analytics and decision-making capabilities," and "provides a way to visualize relationships and make data-driven decisions with greater accuracy and speed."[32]  In SAP's July 31, 2025 article, SAP formally introduced the key features and benefits of the "Knowledge Graphs," emphasizing its capacity to "creat[e] a semantic foundation that helps businesses move beyond disconnected data towards actionable insights."[33]  These are the exact same features provided by o9's EKG, which, as o9 has advertised since 2023, "allows businesses to connect the dots between different data sources and gain insights that they would not be able to see otherwise."[34]

110.    Indeed, SAP did not formally launch its SAP Knowledge Graph until 2025.  On around February 19, 2025—after de Barse and SAP had numerous meetings and after Individual Defendants began mass downloading o9's trade secret materials—SAP described its new knowledge offering as "Enterprise Knowledge Graph,"[35] using o9's exact same technical terminology in its own marketing materials.

---

[31]    Angus Macauly, *SAP Knowledge Graph*, Oct. 24, 2024, https://ignitesap.com/sap-knowledge-graph/ (accessed on November 23, 2025).

[32]    *Id.*

[33]    *What Is a Knowledge Graph*, July 31, 2025, https://www.sap.com/sea/resources/knowledge-graph (accessed on November 23, 2025).

[34]    https://o9solutions.com/videos/explaining-o9s-highly-differentiated-ekg/ (accessed on November 23, 2025).

[35]    February 19, 2025, *Become an Early Adopter for the Knowledge Graph Engine in SAP HANA Cloud*, https://community.sap.com/t5/technology-blog-posts-by-sap/become-an-early-adopter-for-the-knowledge-graph-engine-in-sap-hana-cloud/ba-p/14021136 (accessed on November 23, 2025).

> It has been one of the key announcements for HANA Cloud during TechEd 2024 — the addition of the Knowledge Graph Engine in SAP HANA Cloud. The GA end of Q1 2025 will further strengthen our database-as-a-service's capabilities to help address Business AI scenarios. Among the exciting and new use cases are for example:
>
> - **Linked Data & Federated Querying:** Integrate your internal data with linked open data and query cross-domains, by leveraging federated SPARQL ➡ Enriching clinical research with external biomedical ontologies
> - **Enterprise Knowledge Graphs:** Create a semantic representation of your business data to enhance search, data discovery and eventually decision-making ➡ Connect customer, product, and transaction data for a 360-degree business view
> - **Generative AI & RAG:** Structure your data for AI-driven reasoning and ground LLMs with verifiable Knowledge ➡ Enhance chatbot responses using semantic linking, fact checking and reasoning based on structured Knowledge
> - **Regulatory Compliance & Fraud Detection:** Represent compliance rules as RDF triples and automate checks via inferencing to identify hidden risks through graph-based anomaly detection and relationship patterns. ➡ Detect non-compliant transactions and fraudulent activities by analyzing money transfers and hidden relationships in financial networks

111.    As another example, o9 has been offering clients with AI-driven business planning capabilities long before SAP incorporated AI into its business planning solutions portfolio. o9 continues to innovate including by augmenting its existing implementation of AI and machine learning capabilities with generative AI beginning in 2023. Despite having offered SAP IBP for over a decade, SAP only recently started to introduce AI and machine learning functionalities to its business planning solutions, as indicated by the unveiling of the "SAP Knowledge Graph" and future "generative AI" capabilities for Q1 of 2025.[36]

---

[36]    Angus Macauly, *SAP Knowledge Graph*, Oct. 24, 2024, https://ignitesap.com/sap-knowledge-graph/ (accessed on November 23, 2025).

112.    It has now become evident that SAP wishes to displace o9 as the leader in the advanced business planning solutions space by attempting to copy o9's platform architecture, its capabilities, and its product messaging strategies.

**F.    De Barse, van Houten, and Zonneveld Breached Confidentiality and Compensation Agreements with o9**

113.    De Barse, van Houten, and Zonneveld misappropriated o9's trade secrets and confidential materials and engaged in improper solicitation of other o9 employees and customers with knowledge that their conduct constitutes a material breach of the contracts that the Individual Defendants entered with o9 and the fiduciary duties that they owed to o9 as high-level executives and officers.

114.    Individual Defendants each entered into their respective contracts with o9 voluntarily in exchange for their positions, compensation packages, and access to o9's trade secrets and confidential information.

115.    As detailed above, de Barse was hired by o9 on August 10, 2018.  From December 2022 to March 2025, de Barse was o9's Chief Revenue Officer.  On October 4, 2018, de Barse executed a Confidential Information and Invention Assignment Agreement ("Confidentiality

Agreement").[37]   Among other provisions, de Barse voluntarily agreed under his Confidentiality

Agreement "to hold in strictest confidence, and not to use, except for the benefit of the Company

to the extent necessary to perform my obligations to the Company under the Relationship, and not

to disclose to any person, firm, corporation or other entity, without written authorization from the

Company in each instance, any Confidential Information that I obtain, access or create during the

term of the Relationship."[38]

116.    De Barse further agreed "not to make copies of such Confidential Information

except as authorized by the Company," and further to preserve all o9 records and files relating to

its inventions and intellectual property and "not to remove such records from the Company's place

of business except as expressly permitted by [the] Company policy."[39]

117.    The Confidentiality Agreement broadly defines o9's "Confidential Information" to

include "information and physical material not generally known or available outside the Company

and information and physical material entrusted to the Company in confidence by third parties,"

including the following:

> technical data, trade secrets, know-how, research, product or service ideas or plans,
> software codes and designs, algorithms, developments, inventions, patent applications,
> laboratory notebooks, processes, formulas, techniques, biological materials, mask works,
> engineering designs and drawings, hardware configuration information, agreements with
> third parties, lists of, or information relating to, employees and consultants of the Company
> (including, but not limited to, the names, contact information, jobs, compensation, and
> expertise of such employees and consultants), lists of, or information relating to, suppliers
> and customers (including, but not limited to, customers of the Company on whom I called
> or with whom I became acquainted during the Relationship), price lists, pricing
> methodologies, cost data, market share data, marketing plans, licenses, contract
> information, business plans, financial forecasts, historical financial data, budgets or other

---

[37]   Ex. 13 (Confidentiality Agreement).

[38]   *Id.*, Section 3.

[39]   *Id.*, Sections 3, 4e.

business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.[40]

118.    De Barse agreed that, upon termination of employment with o9, he "will deliver to the Company *(and will not keep in my possession, recreate or deliver to anyone else)"* any and all document, materials, or information belonging to o9.[41]

119.    De Barse's Confidentiality Agreement further contains a non-solicitation clause providing that, while employed at o9 and for a period of one year following de Barse' departure from o9, he "shall not, directly or indirectly, solicit, induce, recruit or encourage any of the Company's employees or consultants to terminate their relationship with the Company, or attempt to solicit, induce, recruit, encourage or take away employees or consultants of the Company."[42]

120.    De Barse's Confidentiality Agreement further contains a non-competition clause providing that, while employed at o9 and for a period of one year following his departure from o9, he will not "solicit or influence or attempt to influence any client, licensor, licensee, customer or other person either directly or indirectly, to direct any purchase of products and/or services to any person, firm, corporation, institution or other entity in competition with the business of the Company."[43]

121.    Under the Confidentiality Agreement, de Barse was also required to notify his new employer, SAP, of his non-solicitation and non-competition obligations to o9. The Confidentiality Agreement provides, and de Barse agreed, that: "I agree that during the periods of time during

---

[40]   *Id.*, Section 3b.

[41]   *Id.*, Section 5 (emphasis added).

[42]   *Id.*, Section 8a.

[43]   *Id.*, Section 8b.

which I am restricted in taking certain actions by the terms of this Agreement . . *I shall inform any entity or person with whom I may seek to enter into a business relationship . . . of my contractual obligations* under this Agreement."[44]

122.    De Barse was well-aware of his contractual obligations to o9 while he was working for o9, and after he left for SAP.  In fact, out of an abundance of caution, o9's legal department specifically reminded de Barse of his confidentiality, non-solicitation, and non-competition obligations to o9 under the Confidentiality Agreement in his termination letter.

123.    SAP knew or should have known de Barse's obligations under his o9 Confidentiality Agreement consistent with the third-party notice provision above.  Nevertheless, SAP willfully participated in and facilitated de Barse's solicitation of o9 employees in breach of the Confidentiality agreement, as shown by other SAP employees coordinating with de Barse inviting o9 employees to have "confidential" calls to hide the solicitation.

> Hi Karolina,
>
> I'm working with Stephan de Barse, our new President of Global Business Suite at SAP. We're anticipating a new confidential global leadership role in support of our Business Network solution.
>
> Would you be open to a brief, confidential call to discuss it in more detail?
>
> Tammi
> tammi.canoose.hall@sap.com
>
> tammi.canoose.hall@sap.com

124.    While employed at o9 from 2018 and 2024, de Barse also signed at least nine stock option compensation agreements with o9, in each instance agreeing to be bound by the substantially the same or identical confidentiality, non-solicitation, and non-competition

---

[44]    *Id.*, Section 7 (emphasis added).

provisions in exchange for receiving generous compensation packages in the form of stock option grants.[45]

125.    For example, on April 22, 2024, de Barse executed a Long-Term Incentive Plan ("Stock Option Agreement") with o9.



126.    De Barse's 2024 Stock Option Agreement includes confidentiality provisions stating:

> The Participant agrees that he or she will not, either during the period of the Participant's employment with the Company or at any time thereafter, use for the Participant's benefit or the benefit of another, or disclose, disseminate, or distribute to anyone, including, without limitation, any individual, person, firm, corporation, or other entity, or publish, or use for any purpose, any of the Confidential Information (whether acquired, learned, obtained, or developed by the Participant alone or in conjunction with others), except as properly required in the ordinary course of the Company's business or as the Company directs and authorizes. The Participant agrees that he or she will take all reasonable measures to protect the secrecy of and avoid unauthorized disclosure and unauthorized use of the Confidential Information. The Participant also agrees to notify the Company

---

[45]    De Barse signed o9 Stock Option Agreements affirming his confidentiality, non-solicitation, and non-competition obligations to o9 on at least the following dates: September 17, 2018; October 22, 2018; October 15, 2019; April 13, 2020; December 15, 2020; June 1, 2021; September 5, 2022; April 27, 2023; and April 22, 2024.

immediately in the event of any unauthorized use or disclosure of the Company's Confidential Information of which the Participant is aware. The Participant further agrees that Participant will not remove from any office of the Company any documents, electronically stored information, or related items that contain Confidential Information, including, without limitation, computer discs, recordings, or other storage or archival systems or devices, including copies, except as may be required in the performance of the Participant's duties as an employee of the Company. The Participant also agrees that he or she will not download or store any Confidential Information on any computer or electronic storage system that is not the Company's property, except to perform work for the Company.[46]

127.    The Stock Option Agreement contains a provision stating:

**Return of Documents**. In the event of the Participant's Termination of Service for any reason, the Participant will deliver to the Company all non-personal documents and data of any nature, and in whatever medium, concerning the Participant's employment or service with the Company or any of its Subsidiaries. The Participant agrees that he or she will not take with him or her any of the Company's property, documents, or data of any description or any reproduction thereof, including summaries or notes regarding same, or any documents containing or relating to any of the Company's Confidential Information.[47]

128.    The Stock Option Agreement includes a similar non-solicitation provision as the

Confidentiality Agreement, but for a period of two years:

**Non-Solicitation of Employees**.    The Participant agrees that this non-solicitation of employee covenant in this **Exhibit A** constitutes a reasonable and appropriate means, consistent with the best interests of both the Participant and the Company, to protect the Company's interests in providing valuable equity compensation to the Participant and in preventing the loss or disclosure of the Company's Confidential Information.  As an inducement for the Company's agreement to provide the Participant the equity compensation in this Agreement, and to provide the Participant with the Company's Confidential Information, the Participant agrees that during the Participant's employment, and for a period of two (2) years following the termination or resignation of the Participant's employment, for whatever reason, the Participant will not, alone or in combination with any individual, partner(s), company, corporation, or other entity, including, without limitation, any partner, limited partner, member, director, officer, shareholder, employee, or agent of any such entity, recruit, solicit, or request, directly or indirectly, any employee of the Company to resign or terminate employment with the Company. For purposes of this provision, "***Employee***" means any employee employed by

---

[46]    Ex. 14 (de Barse April 22, 2024 Stock Option Agreement), Exhibit A Section 1b.

[47]    *Id.*, Exhibit A Section 5.

the Company or any Subsidiary during the Non-Solicitation time period specified or during the six (6) month period preceding the Participant's Termination of Service.[48]

129.    The Stock Option Agreement further includes a one-year non-competition provision applicable to the geographic territory of the United States, which prohibits, after termination of employment with o9, de Barse from soliciting o9 customers that he worked with at o9 (for which he acquired o9's trade secrets and confidential information during the course of his o9 employment).  Specifically, de Barse agreed not to:

> (i) solicit business, or attempt to solicit business, from any partner, vendor Customer or Prospective Customer, (ii) interfere with, or attempt to interfere with, the Company's relationship, contracts or business with any partner, Customer or Prospective Customer, or (iii) induce or persuade in any manner, or attempt to induce or persuade, any partner, vendor, Customer or Prospective Customer to curtail or cancel any business or contracts with the Company. For purposes of this Agreement, "***Customer or Prospective Customer***" means any customer or prospective customer with whom the Company did business or who the Company solicited within the preceding two (2) years, and who or which: (A) the Participant contacted, called on, serviced or did business with during the Participant's employment with the Company; (B) the Participant learned of as a result of the Participant's employment with the Company; or (C) about whom the Participant received Confidential Information. This restriction applies only to business which is in the scope of services or products provided by the Company.[49]

130.    The Stock Option Agreement further provides, and de Barse agreed, that the contract "shall be governed by and must be construed and enforced in accordance with the laws of the State of Texas (excluding any conflict of laws rule or principle of Texas law that might refer the governance, construction, or interpretation of this Agreement to the laws of another state)."[50]

---

[48]    *Id.*, Exhibit A Section 3.

[49]    *Id.*, Exhibit A Section 2(b).

[50]    *Id.*, Section 23.

131.    Like de Barse, Zonneveld and van Houten each also each voluntarily signed and agreed to be bound by their Stock Option Agreements each year as part of their o9 compensation packages.

132.    Zonneveld executed at least nine Stock Option Agreements with o9 between 2019 and 2024, each time affirming his confidentiality, non-solicitation, and non-competition obligations to o9, including most recently on April 22, 2024.[51]



Acceptance agreement

When accepting this option grant on Carta, the option holder agreed to the following:

This Option Grant (the "Equity Award") is subject to all of the terms and conditions set forth in the applicable documents available for download in connection with this Equity Award (the "Documents"), all of which are incorporated herein in their entirety.

By entering your full name below, your signature will be applied to the Documents, as applicable, and you acknowledge receipt of, and understand and agree to the details of this Equity Award and the Documents. You further acknowledge that as of the date of this award, the details of this Equity Award and the Documents set forth the entire understanding between you and the Company regarding this Equity Award and supersede all prior agreements, promises and/or representations on that subject. If there is any conflict between the provisions of the details of this Equity Award and those of the Documents, the provisions of the Documents will control.

Plan Documents:
Equity Incentive Plan:    🔗 o9 Solutions - 2020 Long-Term Incentive Plan (LTIP) Amended March 26, 2024.pdf

Form of Option Agreement:    🔗 o9 Solutions - Non-US NQSO (Time-Based) (2020 LTIP) (Dec. 2022).pdf
Form of Exercise Agreement:    🔗 o9 Solutions Stock Option Exercise Notice and Agreement.pdf

*Sean Zonneveld*

Sean Zonneveld
04/22/2024    🔒 41631581-477f-4e70-a065-d7fc2e891ccc

133.    Van Houten executed at least seven Stock Option Agreements with o9 between 2020 and 2024, each time affirming his confidentiality, non-solicitation, and non-competition obligations to o9, including most recently on April 22, 2024.[52]

---

[51]    Ex. 15 (Zonneveld April 22, 2024 Stock Option Agreement).

[52]    Ex. 16 (van Houten April 22, 2024 Stock Option Agreement).

---

Acceptance agreement

When accepting this option grant on Carta, the option holder agreed to the following:

This Option Grant (the "Equity Award") is subject to all of the terms and conditions set forth in the applicable documents available for download in connection with this Equity Award (the "Documents"), all of which are incorporated herein in their entirety.

By entering your full name below, your signature will be applied to the Documents, as applicable, and you acknowledge receipt of, and understand and agree to the details of this Equity Award and the Documents. You further acknowledge that as of the date of this award, the details of this Equity Award and the Documents set forth the entire understanding between you and the Company regarding this Equity Award and supersede all prior agreements, promises and/or representations on that subject. If there is any conflict between the provisions of the details of this Equity Award and those of the Documents, the provisions of the Documents will control.

Plan Documents:
Equity Incentive Plan:    🔗 o9 Solutions - 2020 Long-Term Incentive Plan (LTIP) Amended March 26, 2024.pdf

---

Form of Option Agreement:    🔗 o9 Solutions - Non-US NQSO (Time-Based) (2020 LTIP) (Dec. 2022).pdf
Form of Exercise Agreement:    🔗 o9 Solutions Stock Option Exercise Notice and Agreement.pdf

*Stijn-Pieter van Houten*
Stijn-Pieter van Houten
04/22/2024    🔒 17316da7-59ae-452d-bee9-2204a5a9173c

134.    Zonneveld's and van Houten's Stock Option Agreements with o9 all contain identical or substantially the same confidentiality obligations, return of company property, non-solicitation, and non-competition provisions and/or covenants as those in de Barse's 2024 Stock Option Agreement.

## COUNT I
### Misappropriation of Trade Secrets
### Under the Defend Trade Secrets Act, 18 U.S.C. §§ 1836(b), 1839 *et seq.*
### (Against All Defendants)

135.    o9 re-alleges and incorporates every allegation above in paragraphs 1-134 as fully set forth herein.

136.    o9 owns certain valuable trade secrets in and relating to its innovative advanced integrated business planning offerings, including those trade secrets specifically described above.

137.    These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on o9, including by virtue of the fact that o9 has established itself as a market leader through the expenditure of significant time, money, and resources in developing such confidential information and trade secrets. These trade secrets and

confidential information, as described above, constitute "trade secrets" within the meaning of 18 U.S.C. § 1839(3).

138.    The above-detailed trade secrets that Defendants improperly acquired, accessed, and/or used derive independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means to other persons or entities who might obtain economic value from their disclosure or use.  These trade secrets are foundational to o9's competitive advantages in the market for integrated business planning solutions, and are the result of years of research, development, and substantial cost to o9. Disclosures of such o9's trade secrets and confidential materials have resulted and will result in tremendous harm to o9's business including for instance, loss of customers, revenues, and reputational harms.

139.    o9 has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including those which Defendants misappropriated. These measures include, for example, requiring employees to sign an Employment Contract which details confidentiality and non-disclosure obligations of o9 employees; distributing Employee Handbooks which detail confidentiality obligations of o9's employees; requiring non-disclosure and confidentiality agreements with o9's suppliers, vendors, contractors, and other third-parties before providing access to o9's trade secrets; and other measures described above.  As another example, upon the termination of de Barse's employment, o9 issued a formal letter expressly reminding him about his non-disclosure and confidentiality obligations as well as his obligations to return o9 company property, including o9's trade secrets and confidential information.

140.    o9 has afforded de Barse, Zonneveld, and van Houten access to and use of o9's confidential information and trade secrets in connection with their work at o9.   de Barse,

Zonneveld, and van Houten had a duty to maintain this information as confidential under the terms of their Employment Contracts and Long-Term Incentive Plan, in which they expressly acknowledged and confirmed the confidential nature of these secrets and o9's ownership of them.

141.     As stated above, o9's trade secrets and confidential information relate to o9's products and services used, sold, or purchased, or intended for use, sale, or purchase, across the United States (including o9's integrated business planning platform and solutions offered therein), which are offered and supplied to customers throughout the United States, including numerous customers for numerous projects in this District, as well as throughout the world.

142.     De Barse, Zonneveld, and van Houten have accessed, misappropriated, disclosed, used, and continue to use o9's trade secrets and confidential information in interstate commerce by improper means, without o9's express or implied consent, and in violation of their agreements described above.

143.     De Barse, Zonneveld, and van Houten misappropriated o9's trade secrets and confidential information to benefit themselves, to benefit SAP, and to allow SAP to unfairly compete against and harm o9 by acquiring and using o9's trade secrets, including in this District. Defendants' misappropriation of this type of information, including specifically targeting documents related to o9's biggest customers, undermines o9's competitive position in the market.

144.     SAP, through de Barse's, Zonneveld's, and van Houten's access while they were employed by o9, acquired, accessed, and/or used, and is still using o9's trade secrets and confidential information in interstate commerce by improper means, without o9's express or implied consent, and in violation of their agreements described above.

145.     SAP misappropriated o9's trade secrets and confidential information to benefit SAP, and to allow SAP to unfairly compete against and harm o9 by acquiring and using o9's trade

secrets, including in this District.  SAP improperly acquired o9's trade secrets. Misappropriation of this type of information undermines o9's competitive position in the market.

146.    SAP knew or had reason to know at the time they acquired, accessed, and used o9's trade secrets and confidential information that this information is confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a dusty to maintain secrecy or limit use, including by virtue of de Barse's, Zonneveld's, and van Houten's Employment Contracts. SAP further knew or had reason to know that this information was developed or acquired by o9 at great expense and effort. SAP further knew or had reason to know that o9 maintains this information as confidential, and that this information is not generally available to the public or o9's competitors such that SAP possessing this information would provide significant benefits.

147.    SAP also improperly acquired and participated in the use of o9's trade secrets by virtue of SAP's communications with de Barse, Zonneveld, and van Houten while they were employed by o9, through which SAP induced de Barse, Zonneveld, and van Houten to access, acquire, and disclose o9's trade secrets and confidential information in violation of their confidentiality and non-disclosure obligations to o9.  de Barse, Zonneveld, and van Houten has used and disclosed o9's trade secrets within the course and scope of their employment with SAP and for SAP's benefit.

148.    De Barse and SAP interacted with Zonneveld and van Houten during their download of o9's trade secrets, including after Zonneveld and van Houten accepted employment with SAP.

149.    Zonneveld and van Houten downloaded and subsequently retained o9's trade secrets by copying or uploading the trade secrets onto an external hard drive, personal Google

drive, or other cloud-based software, by printing physical copies of the trade secrets, or by transferring the trade secrets to their personal emails, including after they each accepted employment with SAP.

150.    De Barse's, Zonneveld's, and van Houten's unlawful actions, including the improper acquisition, disclosure, and use of o9's trade secrets during and after their employment with o9, and the use of this information in their roles with SAP, all occurred within the scope of their employment with SAP and was, at least in part, for the competitive benefit of SAP and to confer SAP with an unfair advantage against o9.  SAP is therefore at least vicariously liable for their actions, in addition to being directly liable for their own improper acquisition, use, and disclosure of o9's secrets as alleged herein.

151.    At no time has o9 consented to de Barse's, Zonneveld's, or van Houten's improper acquisition, disclosure, or use of o9's trade secrets for any reasons unrelated to their employment with o9.  Nor has o9 consented to SAP's improper acquisition, disclosure, or use of o9's trade secrets for any reasons unrelated to de Barse's, Zonneveld's, and van Houten's employment with o9.

152.    Defendants have engaged in the actual and threatened misappropriation of o9's trade secrets in violation of the DTSA. Their actions, as set forth herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

153.    Defendants are retaining and using o9's trade secrets and confidential information to compete with and/or otherwise harm o9.  As alleged herein, Defendants committed acts in furtherance of their misappropriation in the United States and in this District, including misappropriation of trade secrets that are managed and/or are originated from this District, with knowledge and intent to harm o9 in this District, as well as attempting to sell and/or selling (and/or

facilitating selling) products and services in the United States and this District that were influenced by and otherwise benefit from their theft.

154.     Defendants' misappropriation has proximately caused damage to o9, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities—for which o9 is seeking damages.

155.     Defendants have been unjustly enriched as a further proximate result of their misappropriation of o9's trade secrets and confidential information—for which o9 also is seeking damages.

156.     Defendants' actions in misappropriating o9's trade secrets and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress o9 and improve their own economic opportunities, thereby justifying an award of punitive damages against them pursuant to 18 U.S.C. 1836(b)(3)(C) and attorneys' fees pursuant to 18 U.S.C. 1836(b)(3)(D).

157.     o9 is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining Defendants from further possessing, using or disclosing o9's trade secrets and confidential information; (2) enjoining Defendants from altering or deleting o9's trade secrets and confidential information, or any related evidence; and (3) requiring Defendants to turn over any and all copies of o9's trade secrets and confidential information to o9.

### COUNT II
**Misappropriation of Trade Secrets Under the**
**Texas Uniform Trade Secrets Act,**
**Tex. Civ. Prac. & Rem. Code Ann. §§ 134A.001–134A.008**
**(Against All Defendants)**

158.     o9 re-alleges and incorporates every allegation above in paragraphs 1-157 as fully set forth herein.

159.    o9 owns certain valuable trade secrets in and relating to its innovative advanced integrated business planning offerings, including those trade secrets specifically described above.

160.    These confidential and proprietary trade secrets are of substantial economic value and have conferred a competitive advantage on o9 by virtue of the fact that o9 has established itself as a market leader through the expenditure of significant time, money, and resources in developing such confidential information and trade secrets.  These trade secrets and confidential information, as described above, constitute "trade secrets" within the meaning of Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(6).

161.    The above-detailed trade secrets that Defendants acquired, accessed, and/or used derive independent economic value, both actual and potential, from not being generally known to and not being readily ascertainable through proper means to other persons or entities who might obtain economic value from their disclosure or use.  These trade secrets are foundational to o9's competitive advantages in the market for integrated business planning solutions, and are the result of years of research, development, and substantial cost to o9.  Disclosures of such o9's trade secrets and confidential materials resulted and will result in tremendous harm to o9's business including for instance, loss of customers, revenues, and reputational harms.

162.    o9 has taken the above-described reasonable measures to protect the secrecy of its trade secrets and confidential information, including those which Defendants misappropriated. These measures include, for example, requiring employees to sign an Employment Contract which details confidentiality and non-disclosure obligations of o9 employees; distributing Employee Handbooks which detail confidentiality obligations of o9's employees; requiring non-disclosure and confidentiality agreements with o9's suppliers, vendors, contractors, and other third-parties before providing access to o9's trade secrets; and other measures described above.  As another

example, upon the termination of de Barse's employment, o9 issued a formal letter expressly reminding him about his non-disclosure and confidentiality obligations as well as his obligations to return o9 company property, including o9's trade secrets and confidential information.

163.    o9 has afforded de Barse, Zonneveld, and van Houten access to and use of o9's confidential information and trade secrets in connection with their work at o9.  de Barse, Zonneveld, and van Houten had a duty to maintain this information as confidential under the terms of their Employment Contracts and Long-Term Incentive Plan, in which they expressly acknowledged and confirmed the confidential nature of these secrets and o9's ownership of them.

164.    As stated above, o9's trade secrets and confidential information relate to o9's products and services used, sold, or purchased, or intended for use, sale, or purchase, across the United States (including o9's integrated business planning platform and solutions offered therein), which are offered and supplied to customers throughout the United States, including numerous customers for numerous projects in this District, as well as throughout the world.

165.    De Barse, Zonneveld, and van Houten accessed, disclosed, and used o9's trade secrets and confidential information by improper means, without o9's express or implied consent, and in violation of their agreements described above.

166.    De Barse, Zonneveld, and van Houten actually misappropriated o9's trade secrets and confidential information to benefit themselves, and to benefit SAP, and to allow SAP to unfairly compete against and harm o9 by acquiring and using o9's trade secrets, including in this District. Misappropriation of this type of information undermines o9's competitive position in the market.

167.    Leveraging de Barse's, Zonneveld's, and van Houten's access while they were employed by o9, SAP acquired, accessed, and/or used, and is still using o9's trade secrets and

confidential information by improper means, without o9's express or implied consent, and in violation of their agreements described above.

168.    SAP actually misappropriated o9's trade secrets and confidential information to benefit SAP, and to allow SAP to unfairly compete against and harm o9 by acquiring and using o9's trade secrets, including in this District.  SAP improperly acquired o9's trade secrets. Misappropriation of this type of information undermines o9's competitive position in the market.

169.    SAP knew or had reason to know at the time they acquired, accessed, and used o9's trade secrets and confidential information that this information is confidential and was acquired and maintained by improper means and/or under circumstances giving rise to a dusty to maintain secrecy or limit use, including by virtue of de Barse's, Zonneveld's, and van Houten's Employment Contracts. SAP further knew or had reason to know that this information was developed or acquired by o9 at great expense and effort. SAP further knew or had reason to know that o9 maintains this information as confidential, and that this information is not generally available to the public or o9's competitors such that SAP possessing this information would provide significant benefits.

170.    SAP, at minimum via de Barse, van Houten, and Zonneveld, also improperly acquired and participated in the use of o9's trade secrets, including by virtue of SAP's communications with de Barse, Zonneveld, and van Houten while they were employed by o9, through which SAP induced de Barse, Zonneveld, and van Houten to access, acquire, and disclose o9's trade secrets and confidential information in violation of their confidentiality and non-disclosure obligations to o9.

171.    De Barse and SAP interacted with Zonneveld and van Houten during their download of o9's trade secrets, including after Zonneveld and van Houten accepted employment with SAP.

172.    Zonneveld and van Houten downloaded and subsequently retained o9's trade secrets by copying or uploading the trade secrets onto an external hard drive, personal Google drive, or other cloud-based software, or by transferring the trade secrets to their personal emails, in connection with accepting employment with SAP.

173.    De Barse's, Zonneveld's, and van Houten's unlawful actions, including the acquisition, disclosure, and use of o9's trade secrets during and after their employment with o9, and the use of this information in their roles with SAP, all occurred within the scope of their employment with SAP and was, at least in part, for the competitive benefit of SAP and to confer SAP with an unfair advantage against o9.  SAP is therefore at least vicariously liable for their actions, in addition to being directly liable for their own improper acquisition, use, and disclosure of o9's secrets as alleged herein.

174.    At no time has o9 consented to de Barse's, Zonneveld's, or van Houten's improper acquisition, disclosure, or use of o9's trade secrets for any reasons unrelated to their employment with o9.  Nor has o9 consented to SAP's improper acquisition, disclosure, or use of o9's trade secrets for any reasons unrelated to de Barse's, Zonneveld's, and van Houten's employment with o9.

175.    Thus, Defendants have engaged in the actual and threatened misappropriation of o9's trade secrets in violation of TUTSA.  Their actions, as set forth herein, constitute "misappropriation" within the meaning of Tex. Civ. Prac. & Rem. Code Ann. § 134A.002(3).

176.    Defendants are retaining and using o9's trade secrets and confidential information to compete with and/or otherwise harm o9. As alleged herein, Defendants committed acts in furtherance of their misappropriation in the United States and in this District, including misappropriation of trade secrets that are managed and/or are originated from this District, with knowledge and intent to harm o9 in this District, as well as attempting to sell and/or selling (and/or facilitating selling) products and services in the United States and this District that were influenced by and otherwise benefit from their theft.

177.    Defendants' misappropriation has proximately caused damage to o9, including but not limited to loss of profits, goodwill, competitive advantage, and business opportunities—for which o9 is seeking damages.

178.    Defendants have been unjustly enriched as a further proximate result of their misappropriation of o9's trade secrets and confidential information—for which o9 also is seeking damages.

179.    Defendants' actions in misappropriating o9's trade secrets and confidential information were willful, fraudulent, malicious, and were done with the intent to injure and oppress o9 and improve their own economic opportunities, thereby justifying an award of punitive damages against them pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 134A.004 and attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 134A.005.

180.    o9 is also entitled to injunctive relief to protect its confidential information and trade secrets by (1) enjoining Defendants from further possessing, using or disclosing o9's trade secrets and confidential information; (2) enjoining Defendants from altering or deleting o9's trade secrets and confidential information, or any related evidence; and (3) requiring Defendants to turn

over any and all copies of o9's trade secrets and confidential information to o9, pursuant to Tex. Civ. Prac. & Rem. Code Ann. § 134A.003.

**COUNT III**
**Breach of Contract: Confidentiality Agreement**
**(Against de Barse)**

181.    o9 re-alleges and incorporates every allegation above in paragraphs 1-180 as fully set forth herein.

182.    As described above, de Barse, executed a valid and enforceable Confidential Information and Invention Assignment Agreement ("Confidentiality Agreement") with o9 in August 2018 as a condition of his employment with o9.

183.    Under the Confidentiality Agreement, de Barse agreed to "hold in strictest confidence" o9's Confidential Information.  These obligations, among others, require de Barse to (a) not retain, use, and/or disclose Plaintiff's Confidential Information except to benefit o9, (b) not make copies of such Confidential Information except as authorized by the Company, (c) not remove or destroy record of o9's intellectual property from o9 systems without permission, and (d) return all materials containing o9 Confidential Information upon termination of his employment with o9.

184.    Under the Confidentiality Agreement, de Barse also agreed that, while employed by o9 and for one year after the termination of his o9 employment, he will not directly or indirectly solicit, recruit, or encourage any o9 employees to terminate their relationships with o9 or encourage o9 employees to join another company.

185.    De Barse further agreed under his Confidentiality Agreement that, while employed by o9 and for one year termination of his o9 employment, de Barse shall not solicit, or influence,

or attempt to influence any o9 clients, licensors, licensees, or customers, either directly or indirectly, to direct any purchase of products and/or services to any o9 competitor.

186.    The confidentiality, non-solicitation, and non-competition covenants and/or provisions in de Barse's Confidentiality Agreement are reasonable in scope and duration, are necessary to protect o9's legitimate business interests, and were agreed to by de Barse in exchange for receiving generous compensation packages.    They neither impose an undue burden on de Barse, nor preclude his ability to find gainful employment.

187.    o9 performed all the duties and obligations it owes to de Barse under the Confidentiality Agreement and the terms of his employment with o9.

188.    De Barse breached his confidentiality obligations to o9 under the Confidentiality Agreement by conspiring with other Individual Defendants and with SAP to carry out mass exfiltration of more than 20,000 o9 documents including those containing o9's trade secrets and confidential information, disclosing and/or sharing o9's trade secrets and confidential information with SAP, and exploiting o9's trade secrets and confidential information to benefit SAP and harm o9 as described above.

189.    De Barse breached the non-solicitation covenant in his Confidentiality Agreement by soliciting, recruiting, and/or influencing o9 employees to leave o9, including specifically van Houten and Zonneveld.

190.    De Barse further breached the non-solicitation covenant in his Confidentiality Agreement by recruiting, soliciting, or influencing additional o9 employees to resign or terminate employment with o9 during the applicable non-solicitation periods.  For example, in addition to the Individual Defendants' departures from o9, at least *eight other high-level o9 employees* (all

previously directly working under de Barse) have also resigned from o9 and joined SAP's Global Business Suite business division, for which de Barse serves as President.

191.    Further, de Barse breached his Confidentiality Agreement, including but not limited to the non-competition and non-solicitation covenants, by soliciting, influencing, and/or attempting to influence o9 customers and directing o9 business to SAP, including by exploiting of o9's stolen trade secrets to gain a competitive advantage in the marketplace.  For example, as described above, de Barse instructed and/or coordinated with other Individual Defendants to target and misappropriate hundreds of o9 documents related to products and services o9 provided to o9's customers.  De Barse also met with SAP executives while still employed at o9 to plan and strategize the diversion of o9 customers to SAP.  After de Barse joined SAP, he orchestrated and announced new SAP partnerships with these same companies wherein SAP would provide competing supply chain management solutions to o9 customers and in direct competition with o9.

192.    De Barse continues to use o9's trade secrets and confidential information at SAP to solicit business from o9 customers in breach of their non-competition obligations under the Confidentiality Agreement.

193.    o9 has incurred, and continues to incur, significant damages as a result of de Barse's breaches of his confidentiality, non-solicitation, and non-competition obligations under the Confidentiality Agreement.  o9 is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

194.    Moreover, o9 will suffer significant and irreparable harm as a result of de Barse's breaches of the Confidentiality Agreement, including by the dissemination and destruction of Plaintiff's trade secrets and confidential information, loss of employee relationships, loss of customer relationships, loss of good will, and a loss of competitive advantage.  o9 has no adequate

remedy at law and, unless injunctive relief is granted, o9 will continue to be irreparably harmed by de Barse's breaches in a manner that is not fully compensable by money damages.

## COUNT IV
### Breach of Contract: Stock Option Agreements
### (Against Individual Defendants)

195.    o9 re-alleges and incorporates every allegation above in paragraphs 1-194 as fully set forth herein.

196.    As described above, during their employment with o9, Defendants de Barse, Zonneveld, and van Houten each executed multiple valid and enforceable Stock Option Agreements with o9 in exchange for their receiving generous compensation packages including in the form of stock option grants from o9.

197.    Under their respective Stock Option Agreements, de Barse, Zonneveld, and van Houten each voluntarily agreed they "will not, either during the period of the Participant's employment with the Company or at any time thereafter, use for the Participant's benefit or the benefit of another, or disclose, disseminate, or distribute to anyone, including, without limitation, any individual, person, firm, corporation, or other entity, or publish, or use for any purpose, any of the Confidential Information."[53]   Each Individual Defendant further agreed to not download or store any Confidential Information on any computer or electronic storage system that is not the Company's property except to perform work for the Company, and not take or retain any materials containing o9 Company Property or Confidential Information when they leave o9.

198.    Under their respective Stock Option Agreements, each Individual Defendant agreed that, during the Participant's employment, and for a period of two (2) years following the termination or resignation, the Individual Defendants will not recruit, solicit, or request, directly

---

[53]    Ex. 14, Exhibit A Section 1b.

or indirectly, any o9 employee (including anyone employed by o9 in the preceding six months) to terminate employment with o9.

199.    Under their respective Stock Option Agreements, each Individual Defendant agreed further that, during their employments with o9 and for a period of one (1) year following their departure from o9, the Individual Defendants will not solicit, or attempt to solicit, business from any o9 Customer or Prospective Customer in the United States that overlaps with the scope of o9's products and services.  Defendants were specifically prohibited from soliciting any customers that o9 solicited or did business with in the two years preceding Defendants' departures where: (a) the Individual Defendant worked with on behalf of o9, (b) the Individual Defendant learned about through employment with o9, or (c) the Individual Defendant gained o9 Confidential Information the customer through employment with o9.

200.    The confidentiality obligations and non-solicitation and non-competition covenants in Individual Defendants' respective Stock Option Agreements are reasonable in scope and duration, are necessary to protect o9's legitimate business interests, and were agreed to by the Individual Defendants in exchange for receiving generous compensation packages.  They neither impose an undue burden on Individual Defendants, nor preclude their ability to find gainful employment.

201.    o9 performed all the duties and obligations it owes to each of the Individual Defendants under their respective Stock Option Agreements and the terms of their employment with o9.

202.    De Barse, Zonneveld, and van Houten each breached their obligations to o9 under the Stock Option Agreements by conspiring with other Individual Defendants and with SAP to carry out mass-exfiltration of more than 20,000 o9 documents, including those containing o9's

trade secrets and confidential information, disclosing and/or sharing o9's trade secrets and confidential information with SAP, and exploiting o9's trade secrets and confidential information to benefit SAP and harm o9 as described above.

203.    De Barse breached his non-solicitation obligations set forth in his Stock Option Agreement by soliciting, recruiting, and/or influencing o9 employees to leave o9, including specifically van Houten and Zonneveld.

204.    Defendants de Barse, Zonneveld, and van Houten further breached their non-solicitation obligations under their Stock Option Agreements by recruiting, soliciting, or influencing other o9 employees to resign or terminate employment with o9 during the applicable non-solicitation periods.  For example, following the departures of the Individual Defendants from o9, at least three other high-level o9 employees (all previously directly working under de Barse) have resigned from o9 and joined SAP's Global Business Suite business division, for which de Barse serves as President.

205.    Further, de Barse, Zonneveld and van Houten each breached their respective Stock Option Agreements, including but not limited to the non-competition and non-solicitation covenants, by soliciting influencing, and/or attempting to influence o9 customers and directing o9 business to SAP, including by exploiting of o9's stolen trade secrets to gain a competitive advantage in the marketplace.  For example, as described above, Defendants targeted and misappropriated hundreds of o9 materials relating to products and services o9 provided to its customers.  After de Barse, Zonneveld, and/or van Houten joined SAP, SAP announced partnerships with these same companies, providing SAP's competing business planning and supply chain management solutions to them in direct competition with o9.

206.    Individual Defendants continue to use o9's trade secrets and confidential information to solicit business from o9 customers in breach of their non-competition obligations under the Stock Option Agreements.

207.    o9 has incurred and continues to incur significant damages as a result of Individual Defendants' breaches of their confidentiality, non-solicitation, and non-competition obligations under their Stock Option Agreements with o9.    o9 is therefore entitled to compensatory and exemplary damages in an amount to be proven at trial, as well as reasonable attorneys' fees.

208.    Moreover, o9 will suffer significant and irreparable harm as a result of Defendants' breaches of their Stock Option Agreements, including by the dissemination and destruction of Plaintiff's  trade secrets and confidential information, loss of employee relationships, loss of customer relationships, loss of good will, and a loss of competitive advantage.  o9 has no adequate remedy at law and, unless injunctive relief is granted, o9 will continue to be irreparably harmed by Individual Defendants' breaches in a manner that is not fully compensable by money damages.

## COUNT V
### Tortious Interference with Contractual Relations
### (Against All Defendants)

209.    o9 re-alleges and incorporates every allegation above in paragraphs 1-208 as fully set forth herein.

210.    At all relevant times, Defendants were aware that Plaintiff had valid and enforceable contracts with each of de Barse, Zonneveld, and van Houten, specifically including their respective Confidentiality and Stock Option Agreements (collectively, "o9's Employee Contracts").  As described above, o9's Employee Contracts include non-solicitation, non-compete, and confidentiality terms.  Defendants were also aware that o9 had valid and enforceable contracts

with at least eight other o9 employees that included non-solicitation, non-compete, and confidentiality terms that are the same as, or substantially similar to, o9's Employee Contracts.

211.    Defendants knowingly, intentionally, unjustifiably, and in bad faith interfered and continues to interfere with o9's Employee Contracts.    As described above, Defendants intentionally and improperly induced and continue to induce current and former o9 employees to terminate their employment relationships with o9, and induced them to breach their confidentiality obligations, non-solicitation covenants, and non-competition covenants, including as set forth in Individual Defendants' Confidentiality and Stock Option Agreements by meeting with these individuals and encouraging them to misappropriate o9's trade secrets and confidential information, and inducing them to recruit additional o9 employees to join them.

212.    Each Defendant knew of these agreements when it caused the o9's employees to breach these agreements.  De Barse, Zonneveld, and van Houten each knew of the restrictions in o9's Employment Contracts they voluntarily entered into with o9, including based on their senior positions at o9.  De Barse further received reminders of these agreements and his obligations upon termination at o9.

213.    SAP knew of o9 employees' agreements providing the non-solicitation and non-competition covenants.  Consistent with the third-party notice provision of his Confidentiality Agreement, de Barse was required to inform SAP of his obligations to o9 when he sought employment with SAP.  As President of SAP's Global Business Suite, de Barse acted within the scope of his executive responsibilities and with full knowledge and approval from SAP in soliciting o9 employees to terminate their o9 employment relationships on behalf of SAP.  Further, SAP intentionally covered up its effort to recruit o9 employees, including by reaching out to o9 employees and inviting them to hold "confidential" calls to discuss SAP employment.  Each

Defendant participated and continues to participate, directly or indirectly, in the common plan to interfere with o9's Employee Contracts and Defendants are jointly and severally liable.

214.    SAP is further vicariously liable for the Individual Defendants' conduct in interfering with o9's Employee Contracts, which was done in furtherance of the Individual Defendants' course and scope of their employment with SAP, for the economic benefit and furtherance of the corporate purpose of SAP.

215.    As a direct and proximate result of Defendants' misconduct, Plaintiff has been damaged in excess of $75,000, in an amount to be proven at trial.  Further, as a result of Defendants' conduct, Plaintiff has suffered and continues to suffer substantial and irreparable injury for which there is no adequate remedy at law.

216.    The Defendants acted with malice or a fraudulent intent to harm o9 and improve SAP's own economic opportunities, thereby justifying an award of punitive damages against Defendants.

217.    By reason of the foregoing, Plaintiff is entitled to recover compensatory damages, equitable disgorgement, and punitive damages against Defendants.

## JURY DEMAND

218.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, o9 demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, o9 prays for relief as follows:

1.    Award judgment in favor of o9 and against SAP, de Barse, Zonneveld, and van Houten on o9's trade secret misappropriation claims asserted in its Complaint;

2.    Award judgment in favor of o9 and against SAP, de Barse, Zonneveld, and van Houten on o9's breach of contract claims asserted in its Complaint;

3.    Award judgment in favor of o9 and against SAP, de Barse, Zonneveld, and van Houten on o9's tortious interference with contract claim asserted in its Complaint;

4.    Declare Defendants have no rights or privileges to use o9's trade secrets and confidential information;

5.    Award preliminary and/or permanent injunctive relief prohibiting SAP, de Barse, Zonneveld, and van Houten, and all those acting on its behalf or in active concert or participation with it, from possessing, using, transferring, and disclosing o9's trade secrets and confidential information;

6.    Award a preliminary and/or permanent injunction requiring Defendants to return all stolen information and documents (and all material derivative from such information) to o9;

7.    Award preliminary and/or permanent injunctive relief prohibiting de Barse, Zonneveld, and van Houten, and all those acting on its behalf or in active concert or participation with it, from improperly competing with o9 or soliciting o9 employees and customers in violation of their contract obligations;

8.    Award o9 damages in an amount to be determined at trial, including without limitation, o9's lost revenues and profits, and any unjust enrichment, restitution, or disgorgement, breach of contract damages, tortious interference with contract damages, plus a reasonable royalty to the extent permitted under the law;

9.    Award o9 punitive and/or exemplary damages in an amount to be determined;

10.    Award o9 pre-judgment and post-judgment interest, attorneys' fees and costs, and other expenses incurred in this action; and

11.    Award o9 such other and further relief as the Court may deem to be just and proper.

Dated: November 25, 2025

Respectfully submitted,

*/s/ Taj J. Clayton*
Taj J. Clayton, P.C. (Texas Bar No. 24050427)
taj.clayton@kirkland.com
Carson D. Young (Texas Bar No. 24106613)
carson.young@kirkland.com
KIRKLAND & ELLIS LLP
4550 Travis Street
Dallas, TX 75205
Telephone: 214 432 4931
Facsimile: 214 972 1771

Adam Alper (*pro hac vice* forthcoming)
adam.alper@kirkland.com
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
Telephone: (415) 439-1400

Michael W. De Vries (*pro hac vice* forthcoming)
michael.devries@kirkland.com
Kevin X. Wang (*pro hac vice* forthcoming)
kevin.wang@kirkland.com
KIRKLAND & ELLIS LLP
695 Town Center Dr., Suite 1700
Costa Mesa, CA 92626
Telephone: (714) 982-8822

Christopher Lawless (*pro hac vice* forthcoming)
clawless@kirkland.com
Yanan Zhao (*pro hac vice* forthcoming)
yanan.zhao@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200

Attorneys for *Plaintiff o9 Solutions, Inc.*